13 P.(2d) 417

## STATE v. ESKILDSON.

### No. 3709.

Supreme Court of New Mexico.

June 27, 1932.

Rehearing Denied Aug. 9, 1932.

Hugh B. Woodward and Gilberto Espinosa, both of Albuquerque, for appellant.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

SADLER, J.

This is an appeal from a conviction of second degree murder had in Bernalillo county on change of venue from Sandoval county. The appellant will be referred to herein as defendant. His first and principal point relied upon for reversal is that the verdict upon which the judgment of conviction is based is without substantial support in the evidence. A determination of this point neces-

sarily involves a consideration of all the evidence introduced at the trial.

On October 26, 1930, about 8:30 p. m., the defendant, a federal prohibition agent under supervision of the Albuquerque office, in the company of Mrs. Margaret Phillips and her young son 15 years of age, was returning to Albuquerque over the Santa Fé-Albuquerque highway from a Sunday afternoon automobile drive to the vicinity of Estancia. While making a dangerous curve approximately one mile north of Bernalillo in Sandoval county, and while on the paved portion of said highway, the defendant's attention was attracted to an overturned car in the ditch on the right-hand side of the highway looking south, which evidently had failed to take this curve. He brought his car, a Ford coupé, to a stop, got out, and returned for the stated purpose of seeing if he could be of assistance.

The car in distress belonged to one Miguel Castillo. A short while before he and one Liberato Leyba had left the little settlement of Llanito, less than a mile north on the highway, to drive to Bernalillo, approximately two miles south. Upon the overturning of their car, as testified by them, they had walked back to Llanito, secured the assistance of four men, including the deceased Uvaldo Martinez and his father, Pedro Martinez, had returned to the scene of the accident, and had just succeeded in placing the car upright when they became aware of defendant's presence. The defendant says he actually assisted four or more of them in restoring the overturned car to its upright position. But this conflict is unimportant, and is mentioned only as an incident to the main fact on which the parties seem to agree, viz., that the defendant did not arrive on the scene until after the occupants of the car had visited and returned from Llanito with assistance.

From this point of time an irreconcilable conflict in the testimony of the witnesses for the state and the defense on most of what transpired thereafter presents itself. The defendant says that he detected a very strong odor of liquor on the men and in the car; that the men had been drinking, and that the owner and other occupant of the overturned car were in a badly intoxicated condition; that he proceeded to search the car, finding no liquor; that the owner of the car, Miguel Castillo, demanded to know by what authority he searched the car; that he informed him he was a federal prohibition officer and made the search by reason of the strong odor of liquor detected in the car; that he backed up onto the paving where a scuffle ensued, and he was struck several blows, Castillo continually demanding that he prove there was liquor present.

The defendant says they followed him one-third of the distance to his own car, parked about 100 feet south of the overturned car; that in the scuffle he had lost a new hat just purchased; that he proceeded to his car, got his gun, remarking to Mrs. Phillips and her son who had remained in the car that he was going back to get his hat.

Defendant says he had just proceeded to the point where his hat lay and picked it up when the party of men with the overturned

car noticed him, and that Castillo and Leyba came up to him; that another scuffle ensued in which he again lost his hat; that Castillo struck him on the lip; that he proceeded to back to his car, holding his pistol on, and followed by them; that he got in his car and was attempting to get it started when some member of the other party, which included the two persons last named, broke out the window of his car and began to endeavor to pull him out; that a shot from the rear was fired about this time which made a bullet hole through the shatterproof windshield of his car; that they were striking at him and endeavoring to pull him through the car window, and he was striking back with his pistol, a certain .45 automatic, to defend himself, when without intention of firing it or of shooting any one the gun was discharged four or five times.

He further testified that upon the gun being thus discharged the members of the attacking party fell back, and he was able to get his car started; that thinking he was being pursued by them, and being under great excitement, he drove very rapidly toward Albuquerque with Mrs. Phillips and her son, and, failing to take a curve at Alameda near Albuquerque, his own car was overturned, in which turnover Mrs. Phillips was seriously injured and the car badly damaged. The defendant himself was in a hospital 23 days following the happenings of this fateful night, though he testified he was uninjured in the turnover, and that the injuries which occasioned his presence in the hospital were received in the scuffle and fight related by him.

As a result of the discharges from the defendant's revolver, one Uvaldo Martinez received a bullet wound through the chest from which he died that night at eleven o'clock, and Liberato Leyba was shot through the hand.

The members of the deceased's party employed about the overturned car upon defendant's arrival there tell an entirely different story in many particulars of what transpired. They agree that defendant charged them with having liquor in the car, and that he searched it. They say they were not drunk and had not been drinking; that there was no gun in their party; that there was no scuffle or fighting; that they demanded defendant's authority for making the search, and that he never at any time informed them he was an officer; that he returned to his car and they to theirs; that presently he returned toward them menacing them with a gun held in his hands; that they went toward him again demanding his authority for the search as well as the reason for thus threatening them with the gun; that they followed defendant who moved backwards toward his own car with the gun still trained upon them; that after he had reached and gotten in his car and while they were standing in a group some three or four feet therefrom, the defendant shot deceased; that Liberato Leyba and Miguel Castillo then jumped toward defendant and seized him as he sat in the car; and that the defendant then shot Leyba in the hand and drove rapidly away.

We have not attempted and shall not attempt to state all of the testimony on the various phases of the case. Substantially the

foregoing reflects the two conflicting stories of what actually occurred as told by the respective witnesses for the prosecution and for the defense. The conflict is irreconcilable. The defense was strongly corroborated in its claim that Miguel Castillo and Liberato Leyba, the two occupants of the overturned car, were intoxicated at the time their car left the road. Three witnesses testified they actually saw the accident and observed the two men emerge uninjured from the overturned car. They expressed the opinion that the two were drunk. Several passing motorists who stopped for a time and drove away, and others including some peace officers brought in contact with the wounded Leyba and others of his party following the homicide, lent corroboration to this claim of drunkenness or drinking on the part of Leyba and Castillo and other members of their party. All members of their party present at the trial stoutly denied they were drunk, or had even been drinking. The state in rebuttal produced certain witnesses who saw and talked with deceased and another member of his party in the late afternoon of the homicide who testified they saw no evidence of drinking by them at such time; and still other witnesses who visited Leyba in the hospital at Albuquerque some hours after the homicide and testified that he gave no evidence of drunkenness at the time of their visit.

However, if the decisive issue in the trial had been the drunkenness vel non of Miguel Castillo and Liberato Leyba, and the verdict be considered ·as affirming their sobriety

(which is not necessarily its effect), we should at least have a case where the jury's finding would be difficult to explain. But their condition as to being sober or drunk was not the main issue. It was a collateral fact important only in so far as it bore upon the credibility of their testimony and that of their associates, testifying to their sobriety, and as reflecting their probable state of mind at the time in question.

The important issue was whether the killing charged was a felonious homicide. Upon this issue the defendant pleaded not guilty. Under that plea in this jurisdiction any one of a number of defenses may be interposed. Self-defense is one. An accidental killing is another. The two defenses are not the same; are, to a recognized extent at least, inconsistent with each other, and calculated to become embarrassingly interwoven.

Undoubtedly defendant's counsel relied upon self-defense as justification for the killing. And defendant testified that he was being attacked before he returned to his car from the vain effort to regain his hat, and that the attack was renewed after he became seated in his car. His testimony finds corroboration in that of the two occupants of his car and as to certain material parts of it in the testimony of the occupants of two other cars stopped at the time near the scene of the homicide. One of these cars drove on a short time before the fatal shooting actually occurred. As above shown, the witnesses for the prosecution disclosed a state of facts immediately surrounding the killing entirely

different from that testified to by witnesses for the defense. While they admit some effort was made to get at the defendant in the car, they say this did not occur until after the defendant had mortally wounded the deceased; that thereupon two of them jumped toward and took hold of him; that immediately the defendant fired additional shots wounding one of them in the hand, and then drove away.

Thus while defendant's counsel relied upon self-defense, and the plea was supported by defendant's testimony to the extent, if believed, of affording justification for his use of the automatic as a club to ward off the assault related, he actually disclaimed the intentional firing of the four or five shots, of which one resulted in the death of deceased and another in the wounding of Leyba. Here is a weakness in the defense, which no doubt impressed the jury. The effect of his testimony is that presumably in the struggle at the car, the safety lock on his automatic (without the release of which he admitted the gun could not be fired) became loosened unknown to him, and that the gun was accidentally discharged the number of times shown; that his automatic was of such kind that if the finger is on the trigger and pressure present on the clip or handle, it will continue to discharge as long as the pressure continues.

██ Shooting at the risk of taking human life is justifiable on the ground of self-defense, even in the face of an assault, only when the defendant as a person of ordinary prudence, firmness, and reason, entertains the genuine belief that it is necessary to save himself from death or great bodily harm. From the state of the record on this vital issue in the case, and viewing conflicts in testimony most favorably to defendant, the jury could have believed the defendant at the moment of firing entertained no genuine fear for his life, nor of great bodily harm. The existence of such a fear was not the occasion of his firing, for he disclaimed firing consciously at all. And yet the jury, permissibly believing the firing to have been intentional, not accidental, may have attributed it to malice, rather than to a fear which they believed nonexistent. And as bearing on the whole case, the jury may have felt that the defendant's act in returning to the scene of trouble after procuring his gun, instead of going on his way, indicated a mischievous design rather than the innocent purpose stated of regaining his hat.

These possibilities are mentioned not as indicating our views on the effect which the jury should have given the evidence, but as suggesting deductions which they could and within their legitimate province may have made in arriving at their verdict. While impartial minds may well disagree with the verdict, it is not one which the testimony and the sphere of legitimate inference surrounding same fail to support. We cannot, without invading the province of the jury, set it aside and award a new trial upon the ground that it is not adequately supported by the evidence. Of course, if the jury resolved the conflicts in the testimony against the defendant in reaching their verdict, as was their

privilege, it is the more strongly fortified against the attack made upon it. As against the claim that the verdict is without substantial support in the evidence, it will be presumed in support thereof that the conflicts in testimony have been so resolved.

The facts in this case fail to bring it within the doctrine announced in State v. Garcia, 19 N. M. 414, 143 P. 1012, and State v. Armijo, 35 N. M. 533, 2 P.(2d) 1075, 1076. In the Garcia Case, a defendant was convicted of manslaughter. The evidence conclusively established that at the time of the alleged offense he was lying unconscious on the floor of a saloon from a bullet wound inflicted by the deceased, who in turn was slain by this defendant's brother. No concert of action between the two brothers was shown. We exercised our inherent power to protect the defendant's fundamental rights and prevent a miscarriage of justice by awarding a new trial, notwithstanding the defendant's right thereto had been waived below by failure to take proper exception. There is no analogy between that case and this.

In the Armijo Case, we held that the "inherently improbable, uncorroborated, testimony of an accomplice, who at a preliminary examination under oath, had declared the innocence of the accused," did not afford the substantial evidence necessary to support a conviction. But there the inherent improbability in the story of the accomplice arose out of the state's case, chiefly the testimony of the accomplice himself. It was not created by resolving a conflict in his testimony with that of other witnesses. Here the testimony for the state standing alone is not inherently improbable, which distinguishes that case from the case at bar.

It is suggested that the remarks of the court in pronouncing sentence reflected a feeling on the part of the trial court that passion or prejudice entered into the verdict. We have carefully examined the entire statement, and do not so consider it.

■■ It is next urged that the court erred in overruling another ground of defendant's motion for a new trial, namely, the alleged mental incompetency of one of the jurors who sat in the case; also in refusing to permit Dr. B. J. Weigel to testify in support of said ground, and in refusing to permit testimony by W. F. Cheek, Regional Attorney for the United States Veterans' Bureau, as to official records touching the mental qualifications of this juror. The affidavits of Dr. Weigel and Attorney Cheek were before the court as exhibits attached to the motion. Where, by statute, proof on motions for new trial is required to be, or under rule or practice of the court customarily is, in the form of affidavits, it is within the discretion of the trial court whether it will receive oral testimony in addition to affidavits. 46 C. J. 347; Burnham v. Grant, 24 Colo. App. 131, 134 P. 254; Gano v. Wells, 36 Kan. 688, 14 P. 251; City of Kansas City v. Bacon, 147 Mo. 259, 48 S. W. 860; Zander v. Fanslaw, 29 Ohio App. 259, 162 N. E. 745; Myers v. Cabiness, 44 Okl. 671, 146 P. 33; Borley v. Allison, 181 Mass. 246, 63 N. E. 260.

The position taken here by the defendant, however, is not that the court abused its discretion in denying this ground of the motion, but that it arbitrarily refused to exercise its discretion by going into the matter at all. He concedes that, if the court had in the exercise of its discretion denied this ground of the motion, ordinarily its action would not be subject to review. And such is the settled rule in this state. Territory v. Emilio, 14 N. M. 147, 89 P. 239; State v. Nance, 32 N. M. 158, 252 P. 1002; State v. Manzanares, 33 N. M. 573, 272 P. 565.

The situation as disclosed by the record is peculiar. Dr. B. J. Weigel was tendered as a witness in support of this ground of the motion. It appeared from his affidavit attached to motion that he was psychiatrist for the United States Veterans' Bureau at Albuquerque, and that it was in such capacity he examined the juror in question. When he was about to testify, the state objected on the ground that his examination having been made in an official capacity, the giving of testimony on the result thereof was within the interdiction of a federal statute called to the attention of the court. The court after reading the statute would not permit the examination of Dr. Weigel. That this statute was the basis of the court's ruling on his testimony, at the time it was made, is shown by the following colloquy between the court and counsel:

"Mr. Woodward: We submit that it is a matter to be invoked by the claimant and not by the State of New Mexico.

"Mr. McGuinness: Invoked by the juror you are attacking.

"The Court: That is a pretty strong statute.

"Mr. Woodward: We are not proposing to offer any direct evidence. We are offering here the testimony of an expert psychiatrist and physician as to the mental condition of the juror, Mr. Snyder, for the purpose of sustaining the allegations in the motion.

"The Court: He is the Bureau physician, of course?

"Mr. Woodward: Yes.

"Mr. McGuinness: I think if the examination was made in his official capacity, I think it comes within that Statute.

"The Court: Yes, I think so; I don't believe I will go into that.

"Mr. Woodward: We except. There is no way in which we can compel this juror to submit to an examination."

It is not here urged that the court erroneously applied the federal statute made the basis of his ruling. If the matter closed here, it is clear there would be nothing before us for review on this phase of the case. But it does not, and the question is whether the subsequent proceedings put the court in error.

At this point in the trial, the court interrogated defendant's counsel briefly as to the law on the mental incompetency of a juror. The latter replied stating his views. Thereupon the court said:

"The Court: I don't want to beg off and I don't want to be arbitrary about it but un-

less there has been an adjudication that settles his status. I don't believe I will go into it. I remember the juror well. He served throughout the entire term and I think he served in many cases, if I remember rightly, and yesterday I sentenced people to the penitentiary in cases in which he sat, and in my limited observation of him and the conversation with him, I can't believe that he would be the cause of a miscarriage of justice. I will decline to go into that."

Here the matter was dropped, and court and counsel turned to a consideration of other grounds of the motion. Dr. Weigel was the only witness theretofore tendered for oral examination, nor was it intimated previously or at the time of the court's closing remarks, just quoted, that other witnesses were present whom it was desired to examine. Certainly, no other witnesses were tendered for oral examination. While the court did indicate the view that unless the juror had been adjudicated, that settled his status, and so it does presumptively; nevertheless, the court at the same time, with such affidavit evidence before it as might properly be considered (the federal statute may have eliminated Dr. Weigel's affidavit as well as his testimony), drawing upon its own observation of the juror throughout the term and in several cases in which he had sat, and the judge's recollection of a conversation had with him, found and held against the defendant on this issue, thus, as we hold, exercising the court's discretion in the matter. So holding, we overrule this ground of error.

The court was not in error in overruling the ground of the motion for new trial setting up statements after verdict by one of the juror's supported by the affidavit of a deputy sheriff to whom the statements were allegedly made. State v. Analla, 34 N. M. 22, 276 P. 291; State v. Nevares, 36 N. M. 41, 7 P.(2d) 933.

Other errors are assigned, which, after mature consideration, we find to be without merit. The decision of this case has involved, besides a consideration of the legal questions presented, the careful reading of a voluminous transcript. After thus reading the entire record and giving full consideration to the arguments presented, we fail to find error in the judgment appealed from. It will therefore be affirmed.

It is so ordered.

BICKLEY, C. J., and WATSON and HUDSPETH, JJ., concur.

PARKER, J., did not participate.