**UNITED STATES of America**

v.

**John DIOGUARDI and Louis Ostrer.**

**No. 71 Cr. 558.**

United States District Court,
S. D. New York.

July 18, 1973.

Jay Goldberg, and Edward S. Panzer, New York City, for defendant Dioguardi.

Maurice Edelbaum, New York City, for defendant Ostrer.

EDELSTEIN, Chief Judge.

## OPINION

Defendants John Dioguardi and Louis Ostrer were indicted on May 27, 1971, and brought to trial on January 4, 1973, for conspiring to violate and for violating the federal securities laws[1] and regulations[2] and the federal mail fraud statute.[3] On January 26, 1973, after three days of deliberations, a jury returned verdicts of guilty against both defendants.[4] Defendants have now moved for a new trial, pursuant to F.R. Cr.P. 33,[5] on the ground that one of the jurors suffered from "a mental infirmity making her incapable of rendering efficient jury service" within the meaning of 28 U.S.C. § 1865(b)(4).[6]

In support of their motion, defendants rely upon a letter which was sent to

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y.; Harold F. McGuire, Jr. and S. Andrew Schaffer, Asst. U. S. Attys., for plaintiff.

1. Section 17(a) of the Securities Act of 1933, prohibiting fraud in the sale of securities. 15 U.S.C. § 77q(a) (1970). Wilful violation of this section is made criminally punishable by section 24 of the Securities Act of 1933, 15 U.S.C. § 77x (1970).

2. Securities and Exchange Commission Rule 10b–5, prohibiting fraud in the purchase and sale of securities. 17 C.F.R. Section 240.10b–5, promulgated under 15 U.S.C. § 78j(b) (1970). Wilful violation of this rule is made criminally punishable by section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff (1970).

3. 18 U.S.C. § 1341 (1970), the federal mail fraud statute.

4. The jury found Ostrer guilty of 11 of the 17 counts submitted to them for their consideration; and Dioguardi guilty of 4 of the 19 counts submitted to them for their consideration.

5. Rule 33 of the Federal Rules of Criminal Procedure states:

 The court on motion of a defendant may grant a new trial to him if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period.
 As amended Feb. 28, 1966, eff. July 1, 1966.

6. Section 1865(b)(4) states, in pertinent part:

 (b) In making such determination [whether a juror is qualified to serve] the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—
 * * * * *
 (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service. . . .

Dioguardi by the juror in question. The letter portrays the juror as a person with religious feelings who believes herself to be a clairvoyant. This clairvoyance, according to the letter, has enabled the juror to conclude that Dioguardi is basically a good person. (The juror repeated the phrase " . . . I saw the good within you . . ..") Nevertheless, the juror affirms her belief that Dioguardi is guilty ("Your mistake your [sic] guilty."); admonishes him for becoming involved with criminals ("Why you let such a relationship exist between you and a man like Hellerman?")[7] and suggests that he should repent and be saved. ("If you repent and run a clean business it is the good within you that will save you, and you will gain what you have lost.")

Defendants have also submitted six letters from six different psychiatrists and an affidavit from a seventh psychiatrist. Based only upon an analysis of the juror's letter and, in some instances, an assumption of the juror's religious feelings, cultural background and intelligence level, the doctors offered, in various ways, their opinion that the juror is, and was during trial, hallucinatory, delusional, psychotic, grandiose and suffered from guilt feelings and a persecution complex; and they attempted to make the legal determination that the juror was not mentally qualified to serve on a jury.

Defendants have requested that this court either (a) hold a hearing "with necessary mental examination" to determine whether the juror was unqualified to serve, and to grant a new trial "should the juror be found to have been unqualified;" or (b) grant a new trial even if the court refuses to hold a hearing.

The demand for a new trial based upon a postverdict attack on a juror's mental competency is an issue of first impression in this circuit. The problem, however, has been considered by the highest tribunals of fourteen states,[8] by an intermediate appellate court in one other state,[9] and by the Courts of Appeals for the First Circuit[10] and Third Circuit.[11] The decisions rendered by these courts all are to the effect that a post-verdict *inquiry* into a juror's mental competency will not be permitted unless the party

---

7. Michael Hellerman was the admitted architect of the scheme for which the defendants were convicted and was a key witness for the prosecution.

8. *Arizona:* Anderson v. State, 54 Ariz. 387, 96 P.2d 281 (1939); *Arkansas:* Brown v. State, 219 Ark. 647, 243 S.W. 2d 938 (1951); Grand Lodge A.O.U.W. of Ark. v. Wood, 113 Ark. 502, 168 S.W. 1070 (1914); *Colorado:* Austin v. People, 106 Colo. 506, 107 P.2d 798 (1940); *Georgia:* Wall v. State, 126 Ga. 549, 55 S.E. 484 (1906), (the Georgia Court of Appeals, an intermediate appellate court, reaffirmed the *Wall* decision in Newton v. State, 66 Ga.App. 103, 17 S.E. 2d 102 (1941)); *Illinois:* Mackin v. People, 115 Ill. 312, 3 N.E. 222 (1885); *Indiana:* Douthitt v. State, 144 Ind. 397, 42 N.E. 907 (1896); *Massachusetts:* Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809 (1911), aff'd. Jordan v. Massachusetts, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912); *Montana:* State v. Bucy, 104 Mont. 416, 66 P.2d 1049 (1937); *New Jersey:* Iverson v. Prudential Ins. Co. of America, 126 N.J. L. 280, 19 A.2d 214 (1941); Burik v.

Dundee Woolen Co., 66 N.J.L. 420, 49 A. 442 (1901); *New Mexico:* State v. Eskildson, 36 N.M. 238, 13 P.2d 417 (1932); *Tennessee:* Durham v. State, 182 Tenn. 577, 188 S.W.2d 555 (1945); *Texas:* Ex Parte Lovelady, 152 Tex.Cr. R. 93, 207 S.W.2d 396 (1947), cert. granted 333 U.S. 867, 68 S.Ct. 787, 92 L.Ed. 787, cert dismissed 333 U.S. 879, 68 S.Ct. 914, 92 L.Ed. 1154 (1948); McKenzie v. State, 116 Tex.Cr.R. 395, 11 S.W.2d 172 (1928); Carter v. State, 102 Tex.Cr.R. 517, 278 S.W. 840 (1925); *Washington:* State v. Welty, 65 Wash. 244, 118 P. 9 (1911); *West Virginia:* State v. Camp, 110 W.Va. 444, 158 S.E. 664 (1931).

9. *Missouri:* Eastman Kodak Stores, Inc. v. Summers, 377 S.W.2d 476 (Kan.City, Mo.App. 1964).

10. Peterman v. Indian Motorcycle Co., 216 F.2d 289 (1st Cir. 1954).

11. United States ex rel. Daverse v. Hohn, 198 F.2d 934 (3rd Cir. 1952), cert. denied 344 U.S. 913, 73 S.Ct. 336, 97 L. Ed. 704 (1953).

seeking to set aside the jury's verdict makes a strong showing as to the existence of the alleged mental infirmity. At a minimum, this showing should be sufficient to overcome the legal presumption that all men are sane.[12] An analysis of the relevant cases reveals no precise formula by which to measure the standard of proof necessary to warrant a post-verdict investigation. They do reveal, however, a difference between a sufficient and an insufficient showing.

■ These cases can be divided into three categories, ranging in degree from the strongest to the weakest showings which have been made in attacking a juror's competency. The strongest showing is illustrated by fact patterns in those cases in which the juror, prior to trial, had been adjudged mentally incompetent; had spent time in a hospital for the mentally ill; and had not been legally restored to competency during the period of his jury service. In such cases, the mere adjudication of incompetency, without a restoration to competency, regardless of the period of time which had elapsed between the date of the adjudication and the date of jury service, was sufficient to overcome the presumption that the juror was sane during the trial.[13] In these circumstances, the courts have held a post-verdict investigation to ascertain the extent to which the disability existed during trial, and the effect the disability had on the juror's consideration of the facts of the case.[14]

12. *See, e. g.* Davis v. United States, 165 U.S. 373, 377–378, 17 S.Ct. 360, 41 L.Ed. 750 (1897); Davis v. United States, 160 U.S. 469, 486–487, 16 S.Ct. 353, 40 L.Ed. 499 (1895); State v. Camp, 110 W.Va. 444, 158 S.E. 664, 667 (1931).

13. Indeed, unless there has been a restoration to competency, there is a rebuttable presumption of continued incompetency. Davis v. United States, 165 U.S. 373, 377–378, 17 S.Ct. 360, 41 L.Ed. 750 (1897); Tarvestad v. United States, 418 F.2d 1043, 1050–1051 (8th Cir. 1969), cert. denied 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970); Hurt v. United States, 327 F.2d 978, 981 (8th Cir. 1964); Kitchens v. United States, 272 F.2d 757, 760 (10th Cir. 1959), cert. denied, 362 U.S. 942, 80 S.Ct. 809, 4 L.Ed. 2d 772 (1960); Gunther v. United States, 94 U.S.App.D.C. 243, 215 F.2d 493, 496 n. 12 (1954); Brown v. State, 219 Ark. 647, 243 S.W.2d 938, 939 (1951); State v. Bucy, 104 Mont. 416, 66 P.2d 1049, 1050 (1937).

14. *For example,* in Anderson v. State, 54 Ariz. 387, 96 P.2d 281 (1939), the juror, several months before trial, had been formally declared incompetent to manage his business affairs and had remained under the disability throughout the trial. At the hearing evidence was adduced which indicated that the juror was an alcoholic, that his business was being ruined as a result of his affliction, that his income was being consumed by his habit, and that the declaration of incompetency was an attempt to save both his money and his business. The court further found that when sober the juror was of sound mind and normal intelligence. Declaring that "there was nothing to show that at the time of trial his condition was not normal," (96 P.2d at 283) the court held that the juror's disability did not adversely affect his ability to properly perform the functions of a juror. For other cases involving pretrial adjudications of incompetency in which the court conducted a post-verdict investigation, *see* Grand Lodge A.O.U.W. of Ark v. Wood, 113 Ark. 502, 168 S.W. 1070 (1914) ("several months" before trial the juror had been declared insane; had been sent to a mental hospital; had remained there for "a short period;" and had been "paroled;" but had never been "legally emancipated from the disability of insanity"); Austin v. People, 106 Colo. 506, 107 P.2d 798 (1940) (16 months before trial, the juror had been adjudged a mental incompetent, but had never been institutionalized nor restored to competency); Brown v. State, 219 Ark. 647, 243 S.W.2d 938 (1951) (approximately 2 years before trial the juror had been adjudged insane by the probate court; had been confined in a mental hospital for 3 months; and had been released without a judicial restoration to sanity); Ex Parte Lovelady, 152 Tex.Cr.R. 93, 207 S.W.2d 396 (1947), cert. granted, 333 U.S. 867, 68 S.Ct. 787, 92 L.Ed. 787, cert. dismissed 333 U.S. 879, 68 S.Ct. 914, 92 L.Ed. 1154 (1948) (the juror had been adjudged insane approximately 7 years before the trial, had been confined in a hospital for the insane; and had been discharged "soon after his confinement" without hav-

■■■ The second category of cases involves jurors who have been declared insane shortly after the verdict was rendered. The adjudications were by an independent tribunal, and the proceedings were completely unrelated to the post-verdict investigation of the jurors' qualifications. As in the first category of cases, the presumption of sanity had been overcome. However, an adjudication of incompetency does not determine a person's mental capacity prior to the determination. Yet, the inference is clear that the underlying causes of the incompetent condition existed before the adjudication. Thus, in this category of cases, due process requires[15] that there be a hearing to establish whether the disability existed during trial, and if it did exist, the effect it had on the juror's deliberations.[16]

Absent the type of showing demonstrated in the first two categories, the courts have been extremely reluctant to invade the privacy of the jury room. Thus, the Court of Appeals for the First Circuit, in Peterman v. Indian Motorcycle Co., 216 F.2d 289 (1st Cir. 1954), the Court of Appeals for the Third Circuit, in United States ex rel. Daverse v. Hohn, 198 F.2d 934 (3rd Cir. 1952), and the Supreme Court of New Mexico, in State v. Eskildson, 36 N.M. 238, 13 P.2d 417 (1932), approved the trial court's refusal to hold an evidentiary hearing absent an adjudication of incompetency. In *Peterman*, the movants offered to prove that

. . . the juror in question, because of mental disturbance, [had] been receiving disability compensation from the Veterans Bureau, that he

ing been legally restored to sanity); Douthitt v. State, 144 Ind. 397, 42 N.E. 907 (1896) (the juror had been confined for a short period in an "insane hospital" approximately 8 years before trial and had been discharged as "improved") ; State v. Bucy, 104 Mont. 416, 66 P.2d 1049 (1937) (approximately 10 years before trial the juror had been declared insane; had been confined in an insane asylum for less than 2 months; and had been released but had never been judicially restored to competency) ; Eastman Kodak Stores, Inc. v. Summers, 377 S.W.2d 476, 481 (Kan.City, Mo.App. 1964) (approximately 20 years before trial the juror had been "adjudicated to be a person of unsound mind and had never been restored;" and had, thereafter, been treated for epilepsy). Three other cases involved similar facts, but no time periods were stated. Durham v. State, 182 Tenn. 577, 188 S.W.2d 555 (1945) ; Carter v. State, 102 Tex.Cr.R. 517, 278 S.W. 840 (1925) ; Newton v. State, 66 Ga.App. 103, 17 S.E.2d 102 (1941).

15. Jordan v. Massachusetts, 225 U.S. 167, 174, 32 S.Ct. 651, 56 L.Ed. 1038 (1912) aff'g. Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809 (1911). In Jordan, the juror was found to be insane and was committed to an "insane hospital" four days after the verdict was rendered. After a lengthy hearing the presiding justice denied defendant's motion for a new trial, ruling that "a fair preponderance

of all the evidence" indicated that the juror was possessed of "sufficient mental capacity during the entire trial" to enable him to render an intelligent verdict. Quoted in 93 N.E. at 814. Both the Supreme Judicial Court of Massachusetts and the United States Supreme Court affirmed. Although the precise question before the Supreme Court involved the propriety of using the "preponderance of the evidence" standard, the Court noted that the holding of a hearing complied with the due process requirement.

16. State v. Camp, 110 W.Va. 444, 158 S.E. 664 (1931) (the juror became insane the day after the verdict was rendered and was hospitalized two weeks thereafter) ; Burik v. Dundee Woolen Co., 66 N.J.L. 420, 49 A. 442 (1901) (the juror became insane "some days" after the verdict) ; Iverson v. Prudential Ins. Co. of America, 126 N.J.L. 280, 19 A.2d 214 (1941) (the juror began evidencing symptoms of a mental illness 6 days after the trial's conclusion and was declared, 2 days later, to be suffering from a type of insanity "which conjures up an imaginary world and results in a loss of 'contact with reality.'" 19 A.2d at 218) ; State v. Welty, 65 Wash. 244, 118 P. 9 (1911) (the juror had been twice adjudged insane and committed to an insane asylum prior to trial; had not been restored to sanity at the time of trial; and 5 months after trial had been re-committed to the asylum).

[had] difficulty in sleeping and concentrating; that his memory [was] not good; that he [had] had depressed periods during which he entertained the idea of suicide; *that he [had] had to undergo treatment for anxiety reaction to a psychic episode expressed by auditory hallucinations; that he has been under the care of a psychiatrist for an extended period, with little prospect of an early overcoming of his difficulties.*

216 F.2d at 293 (emphasis added). Yet, Judge Wyzanski of the United States District Court for the District of Massachusetts refused to hold an evidentiary hearing. According to the opinion of the Court of Appeals, Judge Wyzanski's reason was based upon the fact that the offer of proof, "taken at its face value," did not present "a sufficient ground for impeaching a verdict once returned" because it "contained no suggestion that the juror was insane or had at any time been confined in a sanitarium 'or was so incapacitated that he did not perform as adequately as many people do ordinary occupational tasks.'" *Id.* The Court of Appeals noted that Judge Wyzanski observed the juror during the trial and that he did not get the impression that the juror was incompetent. In its affirmance, the Court of Appeals indicated its approval of "the strong policy against the too-ready impeachment of jury verdicts on the basis of such afterthoughts suggested by a disappointed litigant." *Id.*

Similarly, in *Eskildson,* defendant sought to establish a juror's mental incompetency through the testimony of a psychiatrist. The trial court, however, refused to hold an evidentiary hearing because there had not been "an adjudication that settled [the juror's] status." 13 P.2d at 421. The Supreme Court of New Mexico, while sanctioning the adjudication requirement adopted by the trial court, suggested that a hearing might also be appropriate if the trial judge believed, based upon his observations of the juror during trial, that the juror was incompetent.[17]

■ Finally, the Third Circuit's opinion in *Daverse,* although not precisely on point, is consonant with the policy reflected in *Peterman* and *Eskildson.* In *Daverse,* the defendant attempted to amend a paragraph of a petition for habeas corpus by adding an allegation that the juror suffered from a mental disease. This proposed amendment, however, was framed in uncertain, rather than specific, language (". . . [the] juror . . . *may* be suffering from a mental disease. . . .") 198 F.2d at 937 (emphasis added). Focusing upon the failure to allege "specifically that [the juror] was in fact mentally incompetent or 'insane,'" the Court of Appeals affirmed the District Court's refusal to allow the amendment. In so doing, the court stated:

If a juror's mental competence is to be attacked at the late stage offered by a habeas corpus proceeding, the charge must be made in much more certain terms and not on a tentative basis. A fishing expedition into a juror's competency may not be employed as a basis to attack a conviction valid on its face. To rule otherwise would be to strike a serious blow at the sanctity of the jury system for any juror, who it was alleged might be suffering from paranoid tendencies, could in effect be put on trial as to his mental competence. We cannot sanction such a course.

198 F.2d at 938 (citation omitted). Clearly, something more than just a bare statement of incompetency is de-

---

17. *But see,* McKenzie v. State, 116 Tex. Cr.R. 395, 11 S.W.2d 172 (1928) in which a post-verdict inquiry was conducted notwithstanding the absence of an adjudication of incompetency. The juror's mental competence was challenged on the basis of an application, filed by the juror, "for compensation on the ground of nervous and mental disability incurred during the World War." 11 S.W.2d at 179. It does not appear that the parties put into issue the propriety of conducting a post-verdict investigation.

manded. At a minimum, a party attacking a juror's qualifications must make an offer of proof which, as the First Circuit stated, suggests "that the juror was insane or had at any time been confined in a sanitarium 'or was so incapacitated that he did not perform as adequately as many people do ordinary occupational tasks.'" 216 F.2d at 293. It would be myopic to read the *Daverse* opinion as requiring anything less than a strong showing of mental incapacity. It makes little difference, absent such a strong showing, whether movants charge that a juror *is* suffering from a mental disease or that the juror *may be* suffering from a mental disease. In both instances, the effect of defendant's attack is the same: permission to employ a "fishing expedition into a juror's competency" would be required. Such an expedition cannot be tolerated.

■ A comparison of the offer of proof in the case at bar with the offers made in the cases above should make it abundantly clear that the defendants' offer of proof is insufficient to warrant a post-verdict inquiry into the juror's mental competency. Since there has been no adjudication of incompetency, this case comes within the weakest of the three categories discussed above. Even within this category, the showing is extremely weak. In *Peterman*, for example, the offer of proof was much stronger than the offer made here. There, the allegations were, in effect, that the juror had a history of mental disturbances, and had been, prior to and throughout the trial, under the care of a psychiatrist. Yet, Judge Wyzanski and the First Circuit were in accord that these allegations, even if true, would not warrant the impeachment of the verdict. 216 F.2d at 293. Here, there is no indication that the juror has a history of psychiatric disorders or that the juror

has undergone psychiatric treatments. At best, the defendants' position is comparable with the defendant's position in *Daverse:* A bare allegation of incompetency combined with a request that the court conduct an investigation. To permit a post-verdict inquiry based upon defendants' offer of proof would be to accept the proposition that a fishing expedition may be employed to attack a conviction valid on its face. This cannot be countenanced, particularly in light of *Peterman* and *Daverse.*

■ Moreover, based upon an examination of the general case law governing a post-verdict inquiry into a juror's qualifications, it is clear that a hearing is not required. The purpose of a hearing is not to determine whether or not the claimed disability does exist. Rather, the function of a hearing is to ascertain the extent to which the disability existed during trial, and the effect the disability had upon the juror's deliberations. This view finds support in the Supreme Court's opinion in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). During the trial in *Remmer,* an improper communication was made to a juror and was reported immediately to the court. Improper communications, such as those involved in *Remmer,* have been deemed to be so presumptively prejudicial as to require a new trial.[18] Yet, the trial court never informed the defendant-petitioner of the incident. Instead, based upon the results of a requested F.B.I. investigation, the court concluded that the incident was harmless. Upon learning of these events after trial, the defendant-petitioner moved for a new trial. Without holding a hearing, the trial court denied the motion and the Ninth Circuit affirmed. 205 F.2d 277 (9th Cir. 1953). The Supreme Court, however, held that a hearing was necessary—not to deter-

18. This principle had been enunciated prior to *Remmer*, Mattox v. United States, 146 U.S. 140, 148–150, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Morley v. Cranmore Ski-mobiles, 67 F.Supp. 812 (D.N.H.1946); and has been reaffirmed since *Remmer*, Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1963) (per curiam); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

mine whether the incident occurred—but rather to "determine the circumstances [surrounding the incident], the impact thereof upon the juror, and whether or not it was prejudicial." 347 U.S. at 230, 74 S.Ct. at 451.

This concept of the limited purpose of a hearing is also suggested by the Second Circuit's decision in United States v. Silverman, 449 F.2d 1341 (2d Cir. 1971). There the court indicated that a hearing would be necessary—again, not to determine whether a claimed disqualification existed—but rather to determine whether "the claimed disqualification might have adversely affected the challenged juror's ability to decide the case intelligently." 449 F.2d at 1344. In *Silverman*, an income tax evasion case, the juror's inability to read and write English was not disputed. At the hearing, therefore, the only question facing the court was whether this disability precluded the juror from rendering a fair and impartial verdict.

Similarly, in other cases involving a post-verdict attack upon a juror's qualifications, the existence of the disabling condition was not in issue, for the factors relied upon as being responsible for the disabling condition were readily evident.[19] Thus, where the juror suffered from a physical impairment, the existence of the impairment was not disputed. Where the juror was unable to read or write, this inability was not controverted. Where the juror was an alien, infant or convicted felon, the alienage, infancy or conviction of the juror was not in issue. Where the juror had engaged in some form of misconduct, the fact that the misconduct occurred was not questioned. And where the juror's mental competency was determined in a separate and unrelated proceeding, mental capacity was not contested. What was questioned and what was contested though, was the extent to which the disqualifying factor tainted a juror's deliberations and prevented him from rendering a fair and impartial verdict.

██ In the instant case, however, where the juror's competency has not been determined in a separate and unrelated proceeding, the court would be constrained to perform the additional task of delving into the mind of the juror and making the initial determination of whether or not the juror was mentally competent.[20] Such a probe was not un-

---

19. *See, e. g.*, Raub v. Carpenter, 187 U.S. 159, 161–162, 23 S.Ct. 72, 47 L.Ed. 119 (1902) (infancy, felony conviction); United States v. Silverman, 449 F.2d 1341 (2nd Cir. 1971) (inability to read and write English); United States v. De Leon, 462 F.2d 170 (5th Cir. 1972) (juror under indictment); Holmes v. United States, 284 F.2d 716 (4th Cir. 1960) (improper communications to jury); Ford v. United States, 201 F.2d 300 (5th Cir. 1953) (juror convicted of felony); Ryan v. United States, 89 U.S. App.D.C. 328, 191 F.2d 779 (1951), cert. denied sub. nom., Duncan v. United States, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1951) (improper communications to jurors); Faith v. Neely, 41 F.R.D. 361 (N.D.W.Va.1966) (juror misconduct, intoxication); Hollingsworth v. Duane, 4 U.S. (4 Dall.) 353, 1 L.Ed. 864 (Pa.Dist.1801) (alienage); Lindsey v. State, 189 Tenn. 355, 225 S.W.2d 533 (1949) (deafness); Batson v. State, 216 Ala. 275, 113 So. 300 (1927) (alienage).

20. Although the defendants have requested that the juror undergo a mental examination, it is highly doubtful whether the court has the authority to order such an examination. The Supreme Court has held that federal courts do not have the common law power to order such an examination; Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L. Ed. 734 (1891); *see also* Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941); Camden and Suburban Ry. Co. v. Stetson, 177 U.S. 172, 20 S.Ct. 617, 44 L.Ed. 721 (1900); and no statute can be found which authorizes it. Indeed, in civil cases, the court may only order, upon a motion for good cause, a party or a person under the legal control of party to submit to a mental examination. F.R.Civ.P. 35(a). *See, e. g.* Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). Similarly, in criminal cases, only the defendant is subject to the court's control. 18 U.S.C. §§ 4244, 4245. *See also* Rees v.

dertaken in *Peterman, Eskildson* and *Daverse*; and the court would be ill-advised to undertake such a probe here. Testimony would be necessary at the very least, not only from the subject juror regarding her deliberations, but also from her fellow jurors, regarding the nature and extent of the subject juror's participation in the deliberations.[21] Yet, such a probe militates against the well-established general rule which inhibits a court from inquiring "in any way whatever as to what occurred during the jury's deliberations." United States v. Grieco, 261 F.2d 414, 415 (2nd Cir. 1958), cert. denied 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). Indeed, it is axiomatic that jurors are incompetent to testify as to matters which would impeach their verdict, regardless of the means employed.[22] Hence, courts

have consistently refused to consider letters and affidavits of jurors which attempt to impeach their verdict.[23]

These general rules, however, are not absolute. The Supreme Court, having recognized that the adherence to inflexible rules is incompatible with the administration of justice, has relaxed the rigidity of these rules in order to protect the defendant's Sixth Amendment right to a fair and impartial jury. McDonald v. Pless, 238 U.S. 264, 268–269, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). Nonetheless, post-verdict inquiries remain limited to extraordinary circumstances in which fundamental incompetency or actual bias is shown.[24] Thus, to come within this high standard, "[t]here must be a showing of a *prima facie* case sufficient to satisfy the judge that the [exposure of the jury's discus-

---

Peyton, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1965) (per curiam) ; United States v. Baird, 414 F.2d 700, 710 (2d Cir. 1969), cert. denied, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970) ; United States v. Driscoll, 399 F.2d 135 (2d Cir. 1968) ; United States v. Albright, 388 F.2d 719, 722–724 (4th Cir. 1968) ; Alexander v. United States, 380 F.2d 33, 39 (8th Cir. 1967) ; Pope v. United States, 372 F.2d 710, 721 (8th Cir. 1967) (en banc), vacated and remanded on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). No authority has been cited—indeed, no authority has been found—which permits the court to order a person who is neither a party nor a person under the control of a party in a judicial proceeding, to undergo a mental examination.

21. It has been held that where a juror was able "to intelligently consider the evidence, appreciate the arguments of counsel, the rulings of law, the charge of the court, and to arrive at a rational conclusion," a new trial will not be granted. Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809, 814–815 (1911), aff'd Jordan v. Massachusetts, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912). See Ex Parte Lovelady, 152 Tex.Cr.R. 93, 207 S.W.2d 396, cert. granted, 333 U.S. 867, 68 S.Ct. 787, 92 L.Ed. 787, cert. dismissed, 333 U.S. 879, 68 S.Ct. 914, 92 L.Ed. 1154 (1948) ; Anderson v. State, 54 Ariz. 387, 96 P.2d 281, (1939) ; State v. Camp, 110 W.Va. 444, 158 S.E. 664 (1931) ; Burik v. Dundee Woolen Co.,

66 N.J.L. 420, 49 A. 442 (1901) ; Mackin v. People, 115 Ill. 312, 3 N.E. 222 (1885). *See also* United States v. Silverman, 449 F.2d 1341, 1344 (2nd Cir. 1971) (in which the Court of Appeals stated that a juror must be able "to decide a case intelligently") ; Ford v. United States, 201 F.2d 300, 301 (5th Cir. 1953). In those circumstances in which a hearing might be required, testimony from the subject juror and the other jurors would be necessary to determine whether a juror deliberated intelligently.

22. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) ; Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) ; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

23. The refusal to receive affidavits from jurors attempting to impeach their verdict can be traced to Lord Mansfield's ruling in 1785, Vaise v. Delaval, 1 T.R. 11 (1785) ; and has been "universally followed" in this country. *McDonald*, 238 U.S. at 268, 35 S.Ct. 783.

24. *See, e. g.* Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 94 L.Ed. 734 (1950) ; Frazier v. United States, 335 U.S. 497, 512–514, 69 S.Ct. 201, 93 L.Ed. 187 (1948) ; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) ; United States v. Silverman, 449 F.2d 1341, 1344 (2nd Cir. 1971) ; Ford v. United States, 201 F.2d 300, 301 (5th Cir. 1953).

sions during deliberations] should be let in." Clark v. United States, 289 U.S. 1, 14, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1932). The alleged disability must be "so obvious a disqualification or so inherently prejudicial as a matter of law . . . to require the court, of its own motion or on petitioner's suggestion afterward to set the verdict aside and grant a new trial." [25]

 It has been said that the showing must be of a "constitutional dimension." United States v. Provenzano, 240 F.Supp. 393, 408 (D.N.J.); aff'd per curiam 353 F.2d 1011 (3rd Cir. 1965), cert. denied, 384 U.S. 905, 86 S. Ct. 1340, 16 L.Ed.2d 358 (1966). The mere allegation of the existence of a disability, the "mere charge of a wrongdoing . . . without more," United States v. Clark, 289 U.S. 1, 14, 53 S.Ct. 465, 77 L.Ed. 993 (1933), the mere inclusion in the panel of a disqualified juror, United States v. Silverman, 449 F.2d 1341, 1344 (2d Cir. 1971), does not warrant the disclosure of the debates, thoughts and votes of the jury while considering their verdict.[26] Clearly, post-verdict statements of a juror, with-

out more, which reflect certain beliefs, considered by some to be unconventional, neither meet the high standards mandated by the Supreme Court and the Second Circuit; or justify tearing down the veil of secrecy which properly protects the jury's deliberations.

 Furthermore, if the jurors were permitted to testify, questions relating to the motives and influences which affected their deliberations would be improper. As Judge Timbers has pointed out

Few doctrines are more firmly established in our jurisprudence than the proposition that the validity of a verdict may not be attacked, and hence a new trial will not be granted, upon a showing of the mental operations and emotional reactions of jurors in reaching a particular verdict.

United States v. Reed, 313 F.Supp. 451, 454 (L.Conn.1970). This rule, which was adopted by the Supreme Court in Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), has been consistently reaffirmed both by the Supreme Court[27] and the Second Circuit.[28] *Mattox* drew the distinction

---

25. Frazier, 335 U.S. at 513, 69 S.Ct. at 210. *See also* Clark, 289 U.S. at 14; 53 S.Ct. 465; *McDonald*, 238 U.S. at 268–269; 35 S.Ct. 783; *Mattox*, 146 U.S. at 149, 13 S.Ct. 50.

26. Even the "mere opportunity for prejudice or corruption" may not be a sufficient showing. As Mr. Justice Holmes stated in Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910), "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain a jury trial under the conditions of the present day."

27. Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1952); Hyde v. United States, 225 U.S. 347, 382–384, 32 S.Ct. 793, 56 L.Ed. 1114 (1911); Mattox v. United States, 146 U. S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

28. Miller v. United States, 403 F.2d 77, 83–84 n. 11 (2nd Cir. 1968); United States v. Crosby, 294 F.2d 928 (2nd Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct.

599, 7 L.Ed.2d 523 (1962); United States v. Grieco, 261 F.2d 414 (2nd Cir. 1958), cert. denied, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); Rotondo v. Isthmian Steamship Co., 243 F.2d 581, 583 (2nd Cir.), cert. denied, 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45 (1957); United States v. Reed, 313 F.Supp. 451, 454 (D.Conn.1970), aff'd 437 F.2d 57 (2nd Cir. 1971). Other circuits have also continued to follow this rule. *See, e. g.* Armstrong v. United States, 228 F. 2d 764, 769 (8th Cir.), cert. denied, 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956); Rakes v. United States, 169 F.2d 739, 745 (4th Cir.) cert. denied 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948); Young v. United States, 163 F.2d 187, 188–190 (10th Cir.), cert. denied 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947). The ABA Project on Minimum Standards for Criminal Justice approved in 1968 the following standard relating to impeachment of a verdict:

Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the

between proper and improper testimony: testimony as to *objective* matters ("any facts bearing upon the question of the existence of any extraneous influences") was declared to be proper; however, testimony as to *subjective* matters ("how far that influence operated upon his [the juror's] mind") was deemed to be improper. 146 U.S. at 149, 13 S.Ct. at 53.

The refusal of the Second Circuit to deviate from this rule is amply supported by their decisions. In Rotondo v. Isthmian Steamship Co., 243 F.2d 581 (2d Cir. 1957), a *per curiam* opinion, the court refused to allow a post-verdict examination of the jury, stating

> it is completely well settled that, when objection rests upon the jurors' testimony as to what were the reasons that in fact induced them to find their verdict, the court will not hear them.

243 F.2d at 583 (citations omitted). Moreover, in United States v. Crosby, 294 F.2d 928 (2d Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962), the *Mattox* subjective-objective limitation on the scope of inquiry was specifically relied upon in rejecting a request for a post-verdict examination of jurors. In *Crosby*, the defendants claimed that the jury's deliberations were tainted by the use and knowledge of information obtained from news accounts. Citing *Mattox*, the Court of Appeals acknowledged that juror testimony could be received "to prove the fact that they read the newspaper[s]," 294 F.2d at 949, but not to establish the effect of such knowledge upon their reasoning.[29]

Thus, as Judge Friendly declared in Miller v. United States, 403 F.2d 77 (2d Cir. 1968), "any relaxation of the *Mattox* rule" relating to a post-verdict inquiry into a juror's mental process would be viewed with "apprehension" by this court. 403 F.2d at 84 n. 11.

Continued adherence to these rules is reasonable. To permit a disappointed litigant to distort certain facts, innocent on their face, as a basis for attacking a jury's verdict, would be to open the proverbial Pandora's box. As Judge Smith said in *Crosby*, and Judge Friendly subsequently adopted in *Miller*,

> There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain.

United States v. Crosby, 294 F.2d at 950; Miller v. United States, 403 F.2d at 82.[30] In addition, to permit a verdict to be reopened without a sufficient basis in fact would be to seriously impair the integrity of a verdict. And, by diluting the efficacy of a jury's pronouncement, the constitutional guarantee of trial by jury, asserted by defendants, would also be weakened; for the integrity of a jury's verdict is an undeniable cornerstone of this Sixth Amendment right. *Cf.* United States ex rel. Daverse v. Hohn, 198 F.2d 934, 938 (3rd Cir. 1950). Therefore, before an assault on a verdict

---

mind of a juror or concerning the mental processes by which the verdict was determined.
ABA Project on Minimum Standards for Criminal Justice, Trial by Jury, § 5.7(a) (1968).

29. The Court of Appeals held that the refusal to "examine the jurors as to their mental process" was not error by the district court. 294 F.2d at 950.

30. In State v. Kociolek, 20 N.J. 92, 118 A.2d 812 (1955), the Court stated:

The better reasoned decisions support the exclusion of jurors' testimony as to their mental processes . . . upon the sounder ground that, being personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore . . . such testimony should not be received to overthrow the verdict to which all assented.
118 A.2d at 816 (citations omitted).

receives judicial approval, the Supreme Court's warning in McDonald v. Pless should be considered:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

238 U.S. at 267–268, 35 S.Ct. at 784.

Considering the instant case, I do not believe that the facts justify the reopening of the jury's verdict. Defendants have not offered any evidence of a separate, unrelated determination of mental incompetency. Nor have they sustained their burden of overcoming the presumption of sanity which protects the juror. The most that can be said of their shallow showing is that it invites a "fishing expedition into a juror's competency." This cannot be countenanced. Moreover, there was nothing in the demeanor of the juror during *voir dire*, trial or deliberations to indicate that she was anything but competent to serve on the jury. On *voir dire*, the jurors were asked group questions in an effort to elicit from them their feelings of bias or prejudice which would prevent them from rendering a fair and impartial verdict.[31] In direct colloquy with me, the juror answered directly and responsively, stating that she understood my

---

31. The jurors were asked the following group questions relating to bias and prejudice:

> Does any juror have any mental reservation as to the acceptance of these principles of law?
>
> And I would assume in response to each and every one of my questions that your silence indicates that you do not.
>
> Do you have any preconceived ideas or prejudices that would prevent or hinder you from following the instructions that the Court will give you in greater detail at a later time and the principles of law which have just recently been outlined for you?
>
> Does any juror have any prejudice or bias for or against any point of view concerning the charges summarized for you from the indictment?
>
> Does any juror know or has any juror or member of his family or any associate had any dealings, either directly or indirectly, with the defendants named in the indictment and presently on trial before you or, for that matter, with any member of their families or friends or associates?
>
> . . . . .
>
> Has any past experience of a juror in any way whatsoever caused a juror to doubt his ability to sit as a completely impartial and unbiased trier of the facts? Ladies and gentlemen, I have tried in these questions to direct your attention to possible reasons you might not be able to sit as a fair juror. Let me now ask you quite apart from any prior questions, does any juror have the slightest doubt in his mind for any reason whatsoever that he would be able to serve conscientiously, fairly and impartially in this case and render a true and just verdict according to the law as it will be explained?
>
> . . . . .
>
> Let me try it a different way. I am sure you can recognize that even if I sat here until eternity caught up with me and if I had the infinite judgment of our diety I could not possibly be secure that I have covered every possible question which would root out and bring to the surface any possible prejudice which is important to a consideration of this case. I am not unaware that all of us, without exception, are the subject of various conditioning influences that we acquire in life's work and by virtue of experiences which either bruises us or elevates us, but what you are asked to do as jurors is to sublimate any prejudices or any bias which you may have in determining the facts of the case and to accept the law as given you.
>
> So what I am attempting to find out, and essentially this must rely upon your

questions and comments, and specifying the particular ones which applied to her. Nothing in her responses and demeanor indicated that her reasoning abilities or mental processes were deficient. Indeed, her ability to recall my questions applicable to her, conveyed the opposite impression. Likewise, during the three weeks of trial and three days and nights of deliberations, I did not notice anything unusual about her. Nor was anything unusual concerning her brought to my attention by either the attorneys or jurors. (I might add that the attorneys and the jurors were always quick to bring matters to my attention which they thought of moment).

The defendants' second request that the verdict be set aside even without a hearing is utterly without foundation. A showing which is too weak to permit an inquiry into the jury's deliberations is, *a fortiori*, too weak to warrant a new trial. Also, based upon a comparison of the facts of this case with the facts of those cases in which mental incompetency was alleged by movants and rejected by the courts, it is clear that defendants' showing is too weak to justify setting aside the verdict.[32]

Accordingly, defendants' motion is denied.

So ordered.

> honesty, your good faith and your willingness to be candid with the Court, what I want to find out is upon an examination of yourselves, can you say that you can sit fairly and impartially in judgment in this case should you ultimately be chosen to serve?
>
> Do you have any doubt whatsoever about your ability to render a fair and impartial verdict upon the facts in evidence and the law to be applied to those facts?
>
> Soul searching is what is necessary at this point because essentially, really regardless of how you answer any questions, the fact of the matter remains that I must appeal to your honesty and your sense of fairness to reveal to the Court any sense or any feeling which might make it difficult or impossible for you to render a fair and impartial verdict.
> Transcript of January 4, 1973, at pp. 10, 21–23.

32. In all cases in which a juror's incompetency has been alleged as a basis for attacking a verdict, the courts, for differing reasons, have been unanimous in refusing to grant a new trial. Thus, for example, in Iverson v. Prudential Ins. Co. of America, 126 N.J.L. 280, 19 A.2d 214 (1941), within a week after a verdict was rendered, a juror was found to be suffering from a type of insanity "which conjures up an imaginary world and results in a loss of 'contact with reality.'" 19 A.2d at 218. Nevertheless, the trial court refused to grant a new trial because "it was not shown that the juror was so incompetent at trial as not to be able to comprehend 'the nature and quality' of his acts." *Id.* In State v. Welty, 65 Wash. 244, 118 P. 9 (1911), a juror, prior to trial, had been twice adjudged insane and committed to and discharged from an asylum. Five months after trial, the juror was again adjudged insane and committed to an asylum. The trial court denied defendant's motion for a new trial and the Supreme Court of Washington affirmed. In Anderson v. State, 54 Ariz. 387, 96 P.2d 281 (1939), the juror in question was declared incompetent to manage his own affairs "some months" before trial, and remained under the disability throughout the trial. The Supreme Court of Arizona upheld the trial court's rejection of defendant's motion for a new trial, holding that only a declaration of insanity, without the requisite restoration to sanity, would be sufficient to disqualify a juror. Similarly, in Grand Lodge A.O.U.W. of Ark. v. Wood, 113 Ark. 502, 168 S.W. 1070 (1914), the juror in question had been adjudged insane "[s]everal months before the trial" and had been committed to the appropriate state hospital. Although he was released after a "short period" of confinement the juror was never legally restored to sanity. Admitting that the juror was disqualified to serve, the Supreme Court of Arkansas nevertheless refused to order a new trial. The court reasoned that the disqualification was merely a technical violation of the statute which established qualifications for jurors, and therefore did not warrant a new trial.
*See also* the cases listed in n. 8, *supra.*