UNITED STATES of America,
Plaintiff-Appellee,

v.

Eddie C. ALLEN, Rosa Lee White and
Andrew Preston Perkins,
Defendants-Appellants.

No. 77–5786.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1979.

Rehearing Denied March 21, 1979.

L. Haldane Taylor, Jacksonville, Fla. (court-appointed), for Allen.

James W. Stirling, Jacksonville, Fla. (court-appointed), for White.

Raymond E. Makowski, F. Joseph Du-Bray, Jacksonville, Fla., for Perkins.

Andrew Preston Perkins, pro se.

John J. Daley, Jr., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.

TUTTLE, Circuit Judge:

The defendants were convicted at a jury trial on a one count indictment for operating a numbers lottery in violation of 18 U.S.C. § 1955. This statute prohibits participation in a gambling business which violates state law. Not every gambling business illegal under state law is prohibited by this statute, however, because the statute reaches only those that include five or more

persons and do so for more than thirty days or gross $2,000 or more in a single day.[1]

All the defendants contend that the government did not prove section 1955's jurisdictional requirement of participation by five or more persons for at least thirty days.[2] In addition, Rosa Lee White argues that statements she made to FBI agents and evidence made relevant by these statements were the inadmissible fruits of a search which the district court ruled was unlawful. Andrew Preston Perkins contends that there is insufficient evidence that he participated in the lottery, and that his motion for a new trial should have been granted because a juror was incompetent and because a stricken statement in the prosecutor's closing argument was outside the evidence in the case. We reject all these contentions and affirm the convictions.

## I

The evidence at trial, construed in the light most favorable to the government, *see Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), showed that Andrew Preston Perkins operated a numbers lottery in Jacksonville, Florida. Eddie C. Allen was the "pickup man" who regularly traveled from seller to seller to pick up recorded bets, and Rosa Lee White operated a "checkup house" where she totaled the recorded bets and calculated the payoff on winning numbers and sellers' commissions.

This operation sold three numbers games: on Mondays through Fridays, "Bond;" on Thursdays, "Total;" and on Saturdays, "Races."[3] Each game operated in the same way. Through a seller, a bettor would bet on a two or three digit number, depending on the game played. The seller would record the bet, and between 1:30 p. m. and 3:00 p. m. on the day of the lottery, after betting was closed but before the number was published, Allen would collect the sellers' betting slips.

The government's case unfolded in three parts. The first was the government's investigation. FBI agents conducted visual surveillance of Eddie C. Allen over a period of approximately five months. This surveillance took place on September 15 and 16, October 21, December 2, 9, 16, and 23,

---

1. 18 U.S.C. § 1955 provides in pertinent part:

 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

 (b) As used in this section—

 (1) "Illegal gambling business" means a gambling business which—

 (i) is a violation of the law of a State or political subdivision in which it is conducted;

 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in a single day.

 Fla.Stat. § 849.09 (1973) makes unlawful the promotion, operation, or participation in any lottery for money. It is conceded that the operation of the lottery in question violates this statute.

2. The government made no effort to prove § 1955's alternative jurisdictional requirement by showing that the lottery grossed more than $2,000 in a single day.

3. According to the testimony of the government's expert on gambling, the names of these lotteries are based upon the source of the winning number. "Bond" is a three-digit lottery in which the first two winning digits are taken from the first two digits in the hundred thousands columns of the total issues of bonds sold on the New York Stock Exchange and the third digit is taken from the middle digit in the hundred thousands column in the total figure for shares of stock sold on the Exchange. The winning number in "Total" consists of the last two digits in the total asset and liability figure in millions of dollars of the twelve federal reserve banks in New York City. The "Races" winning number is taken from the digits in the hundreds and tens columns of the total betting handle of a given horse racing track.

 The high-finance sources of the winning numbers contrast with the realities of the betting scheme. The bets were small. On one tally sheet, the median bet was for 50¢. Some were for as little as 10¢. The payoff odds on Total and Races are sixty-five to one, on Bond four hundred to one. Sellers normally received a 35 percent commission on Bond and 20 percent on Total and Races.

1976, and January 1, 13, and 27 and February 3, 1977. The surveillance on all these dates, with the exception of a very brief surveillance on December 23, established a pattern in which Allen would make several midafternoon stops about two to three minutes long. From December 2 on, he would then stop at Rosa Lee White's. From the beginning, his rounds would culminate in a meeting with Andrew Preston Perkins, usually at the Perk and Loretta's Soul Lounge but once in a parking lot adjacent to White's residence. The surveillance showed a generally widening network of stops.

On September 15, 1976, Allen made one stop [4] before going to the Soul Lounge. On September 16 and October 21, Allen made two stops [5] before seeing Perkins at the Lounge; on the former date he was observed handing Perkins some papers.

On December 2 and 9, Allen made the same two stops and then stopped at Rosa Lee White's address before meeting with Perkins. Later, he was observed again meeting with Perkins adjacent to White's, after which Perkins went into White's apartment building.

On December 16, Allen made one additional stop [6] and, instead of going to the Soul Lounge, met with Perkins adjacent to White's. On December 23, during five minutes of surveillance, Allen made one stop at an address which did not appear at any other time during the surveillance.

On January 6, 1977, Allen made the same two stops as in September and October. On January 13, Allen made four stops [7] and the went to White's and Perkins'. On January 23 and February 3, he made five stops [8] and then went to White's and Perkins'.

The government's investigation culminated on February 10, 1977, when FBI agents obtained warrants to conduct searches of the premises at which Allen stopped. Each of these searches except one yielded betting slips and sales totals for Bond, Total and Races lotteries. Some of the papers seized matched those at other locations.

The second part of the government's evidence was the testimony of three persons whose premises were searched on February 10. Each of these witnesses admitted that he or she had sold numbers for at least six months. Anna Flanders, at whose premises Allen stopped during each surveillance except the first and the brief one on December 23, testified that she had sold Bond and Total since early 1976. Originally, she had done so for an O. C. Pace who died in July, 1976. Eddie Allen had picked up numbers from Flanders for Pace and continued to do so since Pace's death; Flanders did not know who was Allen's boss during this time. She identified her handwriting on Bond and Total slips seized at her premises as well as at White's.

Henry Sinclair Puzie, at whose premises Allen stopped on January 13 and 27 and February 3 and who was observed leaving his apartment with Allen on January 13 and meeting with Perkins outside the Soul Lounge on December 9, testified that he sold Bond, Total, and Races for six months to a year. Puzie identified his handwriting on slips found in his apartment and in White's apartment.

Willie Bannister, who appeared in surveillance only on January 27 and February 23, 1977, testified that he sold Bond, Total, and Races for about six months. His testimony was indefinite as to the date when he quit selling. Puzie testified that he began selling when he was recruited by Perkins and that since then Allen picked up bets at Puzie's apartment on Mondays, Thursdays, and Saturdays, and Perkins met with him once a week to settle up. A search of Bannister's Confectionary yielded no paraphernalia. Bannister said that he had spot-

---

4. Leo's Cleaners, operated by Leo Dennis.

5. Leo's Cleaners and the residence of Anna Flanders.

6. At 1147 West 19th Street, the address of an unidentified seller.

7. The same stops as on December 16, 1976 and the apartment of Henry Sinclair Puzie.

8. The same stops as on January 13 plus Bannister's Confectionary, operated by Willie Bannister.

ted the surveillance and gotten rid of any paraphernalia.

The third part of the government's evidence was the testimony of its expert on lottery operations. He explained how the Bond, Total, and Races lotteries operate. He also described the normal structure of a lottery operation as a central operator connected to sellers by a "pickup man" who picks up bets on a regular basis during the afternoons when the number becomes available, and delivers betting slips to a "checkup house."

## II

Rosa Lee White and Eddie C. Allen concede that the government proved the existence of a numbers lottery in which many people participated at various times. Along with defendant Perkins they argue, however, that the government did not prove that five or more persons participated in this numbers operation during any continuous thirty day period. We find no merit in this argument.

■ Although the defendants argue that the government's surveillance was too sporadic and was never conducted regularly over any thirty day period, the repeated pattern established over a period of several months in this case was enough for the jury to infer that the lottery continued during hiatuses in the government's surveillance of Allen. On the basis of this pattern, coupled with the seizure of lottery paraphernalia at the locations which formed part of this pattern, the jury reasonably could have concluded that Perkins, Allen, and two sellers, Anna Flanders and Leo Dennis, were involved in the lottery since September and that Rosa Lee White and the unidentified seller were involved since December 2 and December 16 respectively, more than thirty days preceding the February 10, 1977, searches and arrests. On the basis of the testimony of the sellers, the jury could have concluded that two more sellers, Henry Puzie and Willie Bannister, were involved for approximately six months. The defendants contend for various reasons that this testimony was successfully impeached.

These arguments, however, go to matters of credibility which we must resolve in favor of the government. *Glasser, supra,* at 80, 62 S.Ct. 457; *United States v. Chandler,* 586 F.2d 593, 599 (5th Cir. 1978).

■ Perkins' contention that his own involvement was not proved is also without merit. The direct testimony of Willie Bannister that Perkins recruited him into the numbers operation and met with him weekly to settle accounts, together with Perkins' repeated appearance in the pattern of surveillance, was substantial evidence upon which the jury could conclude that Perkins was the operator of this lottery.

## III

Among the searches conducted on February 10, 1977, FBI agents searched Rosa Lee White's apartment pursuant to a warrant issued by a United States Magistrate. Approximately fifteen minutes after agents began the search, additional agents arrived and began to question White. They gave her *Miranda* warnings, which she indicated she understood, and obtained from her a Waiver of Rights. White told them that she had operated a checkup house for approximately one month, tabulating slips furnished by an unknown person which she would then return by leaving them in an old stove on a porch of her apartment building or under a vehicle in the parking lot.

An agent then went to look at these locations. As he did, he found betting slips and adding machine tapes directly below White's window. When he returned to the apartment with these, White admitted that she had thrown them out the window as agents were entering her apartment. Prior to trial, White moved to suppress paraphernalia seized inside her apartment, her statements to the FBI agents, and the papers she identified. The district court granted the motion with respect to paraphernalia seized within the apartment. The court ruled invalid the warrant authorizing the search because the supporting affidavit did not adequately connect the apartment to be searched with White. At the same time,

however, the court ruled that because this violation of White's Fourth Amendment rights was technical and in good faith, it did not warrant application of the exclusionary rule to voluntary statements given following valid *Miranda* warnings, citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). White contests this ruling, arguing that the statements and the evidence connected by them should have been suppressed as fruits of the unlawful search.

■ The government, among its responses to this contention, attacks the premise on which White's argument is based, that the warrant on which the search was based was invalid.[9] We agree and find that the district court erred in voiding the warrant.

The warrant was founded on an affidavit by FBI Special Agent Dennis Erich. The affidavit contained information from seven confidential informers, all of whom had furnished accurate information before, *cf. Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), tipping off the FBI agents as to the existence of a numbers lottery and identifying Andrew Perkins and Eddie Allen as its central figures. The affidavit recited the efforts of the FBI agents, detailed above, to corroborate this information through surveillance. In addition to recounting Allen's various stops at 1131 Old Kings Road, later identified as White's address, the affidavit said the following about White:

> [Allen] was observed pulling into the residence parking lot at 1131 Old Kings Road and parking the motorcycle. Allen then raised the hood on one of the vehicles parked in the lot. A black female was observed coming out of the residence carrying a cigar box in her hand. This black female walked over to Allen, and Allen was observed placing a small package in a cigar box being held by the female. The female then walked into the

apartment at 1131 Old Kings Road and Allen got on his motorcycle and departed. This same female was observed coming out of the apartment a short time later, getting on a city bus, going downtown and was observed shopping in Cohens Department Store by Special Agent Dennis P. Erich and Curtis T. Crawford.

The affidavit then recounted further observation of White on February 7, 1977:

> Prior to Allen's arrival, at 1131 Old Kings Road, Special Agent Curtis T. Crawford entered 1131 Old Kings Road. Special Agent Crawford proceeded to the third floor stairwell where he was confronted by a black female.
>
> The black female was standing at the first door from the stairs on the third floor. Special Agent Crawford recognized this black female as being the same black female who Crawford had seen on January 13, 1977, meeting Eddie C. Allen in the parking lot adjacent to the apartments at 1131 Old Kings Road and also at May Cohens Department Store on January 13, 1977. At approximately the same time, Allen was observing entering 1131 Old Kings Road and climbing the first floor stairs. As Special Agent Crawford began descending from the third floor stairs, he passed Eddie C. Allen at the second floor. Special Agent Crawford observed Allen continuing to climb the stairs to the third floor and overheard Allen and the same black female conversing. Special Agent Crawford then heard Allen descending the stairs and heard a door closing on the third floor.

On the basis of this information, the magistrate issued a warrant to search "[a] third floor apartment at 1131 Old Kings Road . . . the door to this apartment is located directly at the top of the third floor staircase."

■ A magistrate's factual conclusions in determining that probable cause exists to issue a warrant are entitled to great defer-

---

**9.** White replies that this argument is precluded by the government's failure to take interlocutory appeal or to cross appeal. As the party successful in district court, the government may sustain the judgment below on any grounds supported in the record. *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957); *Raven v. Panama Canal Co.*, 583 F.2d 169, 191 (5th Cir. 1978).

ence. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The magistrate, most closely acquainted with the facts supporting the warrant and often familiar with the affiant, is allowed to exercise his own judgment and to interpret the supporting affidavit as a whole in a realistic and commonsense manner; a doubtful or marginal case should be resolved in favor of his determination of probable cause. *United States v. Harris*, 403 U.S. 573, 577, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1970); *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1955). Indeed, this court has even gone as far as to say that the magistrate's determination "is conclusive in the absence of arbitrariness," *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir. 1973). *Accord, United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978); *United States v. Pike*, 523 F.2d 734, 737 n.4 (5th Cir. 1975); *Payne v. United States*, 508 F.2d 1391, 1393 n.2 (5th Cir.), *cert. denied*, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); *Castle v. United States*, 287 F.2d 657, 661 (5th Cir.), *vacated for resentencing*, 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75 (1961).

 In this light, we find that the district court erred in overruling the magistrate's determination that there was probable cause to search Rosa Lee White's apartment. There was ample basis to conclude that a crime, the operation of a numbers lottery involving five or more persons, was taking place and that the "black female" at 1131 Old Kings Road was a participant. On this basis alone, her apartment may have

been a logical place to search. *See United States v. Maestas*, 546 F.2d 1177, 1179–80 (5th Cir. 1977). In addition, there was evidence in the affidavit before the magistrate that this woman was receiving gambling paraphernalia at her apartment. There was some factual basis for concluding that the apartment to be searched was hers. Without regard to whether this initially was an adequate foundation for probable cause, we cannot conclude that the magistrate acted arbitrarily by issuing a warrant to search White's apartment on the basis of this information.[10]

Because we conclude that the search of White's apartment was valid, the question whether her statements following valid *Miranda* warnings and the evidence stemming from these statements were fruits of an unlawful search is moot.

## IV

 After the jury rendered its verdict but before judgment was entered defendant Perkins moved for a new trial pursuant to Fed.R.Crim.P. 33 on the grounds, inter alia, that a juror was incompetent due to a mental infirmity.[11] After additional investigation, Allen introduced hospital records which showed that the juror in question had been adjudicated incompetent in 1966 and never subsequently adjudicated competent. On the basis of this evidence, the district court allowed an extensive evidentiary hearing on the juror's competence and found that he was competent during his service as a juror.[12]

10. *Cf. United States v. Olt*, 492 F.2d 910, 911–12 (6th Cir. 1974) (affirming magistrate's determination that affidavit showing marijuana located at one of two locations established probable cause to search both).

11. 28 U.S.C. § 1865(b)(4) provides in pertinent part:

 (b) In making such determination [whether a juror is qualified to serve] the chief judge of the district court, or such other district judge as the plan [for random jury selection, *see* 28 U.S.C. § 1863] may provide, shall deem any person qualified to serve on grand and petit juries in the district unless he—

 . . . . .

 (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service . . . .

12. Questions concerning the competency of a jury ordinarily are not entertained once the jury has entered its verdict. There is a general preference for raising issues of jury qualifications before the jury is empaneled. *See, e. g., Tennon v. Ricketts*, 574 F.2d 1243, 1245 (5th Cir. 1978) (grand jury racial discrimination); *United States v. Hawkins*, 566 F.2d 1006, 1013 (5th Cir. 1978) (violation of Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq.). There is also a specific reluctance to probe the minds of jurors once they have deliberated their verdict. *See, e. g., McDonald v. Pless*, 238

Perkins urges that we overrule this finding. His argument rests primarily on the nature of the juror's mental disorder. Two psychiatrists who examined the juror's mental health records testified that he had been diagnosed as suffering from chronic organic brain syndrome. This condition is irreversible. The effects of this disorder, they testified, are memory lapses, disorientation, poor concentration, inappropriate behavior, and difficulty coping with simple, day-to-day tasks. Neither psychiatrist examined the juror himself and so both were unable to give an opinion as to his competency at the time of trial.

■ The juror in question did manifest some inappropriate behavior. On one occasion early in the trial, he blurted out a one word answer to a question propounded to a witness.[13] This incident and the juror's unusual demeanor caused concern both to the court and to the prosecutor. When it became necessary to dismiss one juror and use the only alternate, the court called this concern to the attention of counsel. Recognizing the possibility that it might be necessary to dismiss the juror in question, the court inquired of counsel if they would be willing to proceed with only eleven jurors. All assented. On another occasion, other jurors observed the juror with what appeared to be a liquor bottle in his pocket.

Despite the juror's medical records and his behavior, there was substantial evidence

that he was capable of understanding the proceedings. In his own testimony at the post-trial evidentiary hearing, he showed some recollection of witnesses, testimony, and jury deliberations. He also was able to give an explanation of the presumption of innocence [14] and stated that he made up his own mind in deliberations and stood by his verdict. Seven other jurors testified that he participated in deliberations and seemed rational and comprehending throughout. Those jurors who observed him apparently carrying a liquor bottle said they paid careful attention to his behavior and saw nothing else inappropriate. In addition, one of the psychiatric experts pointed out that recent test results which showed improvement in the juror's intellectual functions were inconsistent with a diagnosis of chronic organic brain syndrome. Moreover, he testified that a person suffering from this condition could have periods of competency. When the juror was questioned during voir dire, he indicated that jury service would necessitate his rising at 5:00 a. m. in order to be in court on time; he did so throughout the trial without evident problems. For these reasons, we affirm the district court's finding that the juror was competent.

### V

■ Seeking in the course of his summation to rebut the defendants' contention

U.S. 264, 269, 35 S.Ct. 783, 59 L.Ed. 1300 (1915).

The district court applied an exception to this general rule recognized in *United States v. Dioguardi,* 361 F.Supp. 954 (S.D.N.Y.1973), aff'd 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). In *Dioguardi,* the court built upon numerous state court decisions and required a strong showing that a juror was incompetent in order to overcome the presumption that a person is sane. Only when this presumption was overcome would the court allow full inquiry into the competency of the juror. This inquiry would address itself to the juror's competency at the time of the trial. 361 F.Supp. at 957. In *Peterman v. Indian Motorcycle Co.,* 216 F.2d 289 (1st Cir. 1954), the First Circuit approved the use of a similar procedure.

In the present case, defendant Perkins' motion for a new trial was made on information and belief. The court allowed Perkins an addi-

tional ten days to make an evidentiary showing in support of his allegation that the juror in question was incompetent. It was after this that Perkins introduced the hospital records showing that the juror had been adjudicated incompetent, and only then did the court allow further investigation and a full evidentiary hearing. In *Dioguardi,* the court noted that an adjudication of incompetency generally has been held to rebut the presumption of sanity and, where there has been no restoration to competency, to establish a rebuttable presumption of continued incompetence. *Dioguardi, supra,* 361 F.Supp. at 957 & n.13.

13. But, the government adds on his behalf, his answer was correct. (The question called for repetition of a previous answer.)

14. "[I]f he is innocent until he is proved guilty, he is not guilty until he is proved guilty."

the government failed to prove the participation of five or more persons in the lottery for thirty days, the prosecutor made the following argument:

The reasonable inference was that [Rosa Lee White] had been involved longer than a month.

Now, look at Leo Dennis, the surveillance takes him back, all the way back to September of 1976 and Ann Flanders all the way back to approximately February 1976.

Subsequently of course at some point, approximately six months after she got in it the head man would have been Mr. Perkins rather than Mr. Pace and Mr. Pace died.

Defendant Perkins objected to this last sentence and moved for a mistrial on the basis that there was no evidence that Perkins succeeded to O. C. Pace's position as operator of the lottery. The district court sustained the objection and instructed the jury to disregard the sentence, but denied the motion for a mistrial. Perkins would have us hold that the statement was so prejudicial as to require a mistrial.

■ Underlying the limitations on comments an attorney may make in closing arguments to a jury is a belief that an attorney cannot make comments which themselves operate as evidence in the case. *See generally United States v. Morris,* 568 F.2d 396, 401–02 (5th Cir. 1978). Nevertheless, an attorney is entitled to urge the conclusions which the attorney thinks the jury should draw from the evidence. The government urges that the prosecutor's comments were proper for this reason and that the district court therefore erred in striking the offending language.

There was evidence to support the inference which the prosecutor drew in his comments. Anna Flanders testified that O. C. Pace recruited her as a seller and that Eddie Allen was Pace's pickup man. Pace died in July, 1976, but Allen continued to pick up numbers from Flanders. There was, as we have already found, substantial evidence that Perkins was the operator of the lottery for which Allen made pickups during this time. It is possible to infer from this continuity that Perkins succeeded to Pace's position. Each attempt to draw an inference such as this should not be the basis of an objection by defense counsel, much less lead to a mistrial.

Even if the inference which the prosecution sought to draw here was beyond the reach of the evidence in this case, it was not substantially prejudicial as to require a mistrial. Because there was some basis in the record for the statement and there was substantial other evidence that Perkins operated the lottery from September, 1976, to February, 1977, the district court's instruction to the jury to disregard the offending language was adequate to cure any prejudice which might have resulted.

For the foregoing reasons, the judgment of the district court is AFFIRMED.