**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Kim Edward MINIS, Defendant-Appellee.**

No. 81–1116

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1982.

Certiorari Denied April 26, 1982.
See 102 S.Ct. 2013.

LeRoy M. Jahn, Asst. U.S. Atty., San Antonio, Tex., Archie Carl Pierce, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellant.

Mark Cohen, Austin, Tex., for defendant-appellee.

Before CLARK, Chief Judge, RANDALL and WILLIAMS, Circuit Judges.

RANDALL, Circuit Judge:

In a search of a six acre rural residence under the custody of defendant-appellant Kim Edward Minis, federal agents discovered multi-pound quantities of marijuana being processed by Minis, approximately three and one-half ounces of cocaine in a safe in the kitchen, and two fields of growing marijuana. Minis was charged in a two-count indictment with possession with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 841(a)(1). The district court, however, granted Minis' motion to suppress the evidence seized in the search on the grounds that the affidavit in support of the search warrant pursuant to which the search was conducted failed to establish the necessary probable cause. The government appeals, arguing: (1) that the district court erred in overruling the magistrate's determination that probable cause existed; and (2) that assuming probable cause did not exist for the issuance of the search warrant, the good-faith exception to the exclusionary rule should have been applied. We conclude that the affidavit supporting the search warrant did establish the necessary probable cause, and we therefore VACATE the district court order granting Minis' motion to suppress and REMAND for consideration of Minis' arguments not resolved in the original proceeding.

*I. Statement of Facts.*

On October 18, 1980, a search warrant was issued for the search of the six acres of property, "including the personal residence located therein and all outbuildings," located at 14808 Hamilton Pool Road, Bee Cave, Texas and identified as the Crooked Oak Ranches.[1] On executing the search warrant, agents discovered Minis processing "multi-pound" quantities of marijuana in the living room of the one-bedroom residence located on the property.[2] They also discovered approximately three and one-half ounces of cocaine in a combination safe in the kitchen of the searched residence and two cultivated fields of marijuana approximately 100 to 150 yards from the residence.

The warrant pursuant to which the search took place was issued on the basis of the affidavit of United States Customs Service Special Agent Kenneth Brumfield. The affidavit set out the personal observations of Brumfield and other agents which allegedly gave them probable cause to believe that William Everett, under their surveillance as part of an investigation of a supposed international drug smuggling conspiracy, was "cultivating marijuana at the location of 14808 Hamilton Pool Road, Bee Caves, Texas, is distributing controlled substances, and secreting the profits derived therefrom in foreign corporations in the Cayman Islands, British West Indies." The warrant therefore authorized the search of the six acres of property, which the affidavit indicated was owned by Everett, located at 14808 Hamilton Pool Road and identified as the Crooked Oak Ranches, including the personal residence located therein and all outbuildings, for controlled substances, currency derived from the sale of such controlled substances and books, ledgers, correspondence and records relating to narcotics transactions and the laundering of currency through foreign corporations.

The affidavit first set out a series of intercepted telephone communications to and from telephone numbers in California, the interception of which was allegedly authorized by a court order from the district

---

1. The affidavit in support of the search warrant also contained a legal description of the property to be searched.

2. In addition to that building, there was also a newly built 3-bedroom house on the property.

court for the Eastern District of California on June 7, 1980. The interception order was allegedly based on information that a group known as the Brotherhood of Eternal Love was going to smuggle approximately 8,000 kilos of hashish into the United States. The first three conversations summarized in the affidavit[3] took place in September 1980 and indicated that Travis G. Ashbrook and a person referred to as "Bill," would be taking a trip "out of the United States with a large amount of United States currency well in excess of the $5,000 required to be reported by 31 U.S.C. 1101."[4] Ashbrook is described in the affidavit as prominent in the Brotherhood of Love, as documented in United States Customs files since 1969, and as having been arrested and convicted of smuggling hashish into the United States in 1969 by a federal court in California. Brumfield believed that the money to be taken out of the United States was to be a down payment for the aforementioned narcotics transaction and for repairs to the vessel which was to be used to smuggle the narcotics into the United States. The fourth conversation allegedly took place on July 20, 1980 between William Everett (believed to be the person referred to as "Bill"), on a telephone located at 2611 Bee Cave Road # 102, Austin, Texas, and Patrick Brignole, allegedly a partner of Ashbrook. The synopsis of this conversation was as follows:

**3.** The summaries were as follows:

I.—Sept. 11, 1980: Travis G. Ashbrook called Mario Pirri in Italy. (A partner in his narcotic smuggling activities.) A synopsis of that telephone conversation is as follows:

PIRRI told ASHBROOK he needed to get in touch with OLIVIT because they needed to make some major decisions about the work being done by GASBARI. PIRRI said he thought it best to talk to OLIVIT because ASHBROOK was not "in tune" with the boat. ASHBROOK agreed saying that he had never seen the boat. PIRRI then told ASHBROOK he (PIRRI) was going to meet their "friend" in Paris on Monday, September 15, 1980, and that he would call ASHBROOK back and let him know the outcome. ASHBROOK told PIRRI to say hello to "ABDUL." PIRRI told ASHBROOK they needed about $65,000 to complete the boat. ASHBROOK said he was going down to "that place" at the end of September and would take 2 for AMHAZ and would send $75,000 to GASBARI for the boat. PIRRI told ASHBROOK the money would have to go through the "company."

II.—Sept. 13, 1980: Travis Ashbrook in a conversation with George Olivit (Ashbrook's step-brother and partner in narcotics smuggling activities). A synopsis of that conversation is as follows:

ASHBROOK and OLIVIT discussed the boat and PIRRI's need to talk to OLIVIT. ASHBROOK told OLIVIT that he (ASHBROOK) was going down "south" in two weeks (end of September 1980) and take a "couple" for their friend as well as $75,000 for the boat. ASHBROOK said he had to send it through the "company." OLIVIT suggested ASHBROOK take "BILL." ASHBROOK agreed because "BILL'S" name was on the deal and that ASHBROOK didn't want to show himself; he would let BILL make the transaction. ASHBROOK said that PIRRI was going to talk to their friend and get everything worked out. ASHBROOK said that PIRRI had agreed to pay for their losses out of his own pocket. ASHBROOK and OLIVIT then talked about a crew for a boat.

III.—Sept. 24, 1980: Travis G. Ashbrook in a conversation with Mario Pirri in Italy. A synopsis of that telephone conversation is as follows:

PIRRI told ASHBROOK that he had seen the friend and that everything was fine. PIRRI said the shipment was "packed and waiting" for them whenever they wanted to pick it up. PIRRI said the "friend" was lowering the price to compensate ASHBROOK for the loss suffered before. PIRRI said that the total payment to the "friend" for the next was to be 5 million but they had to have $400,000 out front. PIRRI said he had already paid the friend $200,000 as part of the $400,000 up front. ASHBROOK said he was going to send the other $200,000 plus $75,000 for the boat in two or three weeks.

**4.** 31 U.S.C. § 1101 provides:

(a) Except as provided in subsection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) from any place within the United States to or through any place outside the United States, or

(B) to any place within the United States from or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States

in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.

"Bill advised that he had 'got the house along pretty good and everything,' and that his garden and plants were starting to come along really good, though the heat wasn't helping the situation. Bill Everett and Pat Brignole discuss the cultivation process and Everett states that he 'did a whole bunch of A's.' (Note— "A's" are known to me to be the African variety of marihuana plants.)"

An excerpt of the conversation was attached to and incorporated in the affidavit.

In addition to the intercepted conversations, the affidavit set out certain activities of Ashbrook and Everett during the week preceeding the search of the Hamilton Pool Road property disclosed by continuing surveillance by United States Customs special agents. The surveillance revealed that on October 11, 1980 Ashbrook left his residence in Lone Pine, California and travelled to Austin. He arrived in Austin on October 13, 1980 where he met with Everett. On October 13, 1980, at 8:00 a. m., Ashbrook and Everett departed 2611 Bee Cave Road, Apartment 102, Austin, Texas and drove to the property located at 14808 Hamilton Pool Road, Bee Cave, Texas.[5] The affidavit indicates that when they left the Bee Cave Road apartment, Ashbrook placed a tan leather case in the truck, but that when they returned to the Bee Cave Road apartment, approximately two hours later, no tan leather case was removed by them. Later that day, they were observed going to an Austin travel agency where they purchased two round-trip tickets from Houston, Texas to Grand Cayman Island, British West Indies, to depart on October 16, 1980 on Cayman Airways and to return on October 18, 1980.[6] Ashbrook and Everett were

again observed going to the Hamilton Pool Road property on October 14 and 15, 1980 for about four hours each day. On the morning of October 16, 1980, Everett was again observed going to the Hamilton Pool Road property for about one hour.

Finally, the affidavit discloses that later on the morning of October 16, 1980, Ashbrook and Everett were observed departing the Bee Cave Road apartment from which they travelled to Houston, Texas and then to Houston Intercontinental Airport. They were observed checking in at the Cayman Airways ticket counter for Flight 63 to the Cayman Islands. When Ashbrook and Everett failed to fill out United States Customs currency reporting forms before taking their seats on the plane, agents executed a federal search warrant on their checked luggage and their persons. In the luggage, the agents found, among other things, $170,000 in United States currency and letters, documents and correspondence indicating an interest in a foreign corporation in the Cayman Islands, British West Indies.

*II. The District Court Finding of No Probable Cause.*

A preliminary hearing was held, on October 31, 1980, at which the United States Magistrate found probable cause for the search of the Hamilton Pool Road property. On January 7, 1981, a hearing was held on Minis' motion to suppress the evidence seized in this search, however, and on January 14, 1981, the district court ordered that all evidence seized in the search be suppressed in the trial of Minis.[7] The district court held that the information contained in the affidavit did not satisfy the test of

---

5. The affidavit also states that Ashbrook possessed a Texas driver's license in the name of Michael Webber at the Bee Cave Road address. Also noted in the affidavit was that investigation disclosed that no house existed at the Hamilton Pool Road site in February 1980 and that there was at the time of the affidavit a new house at that location.

6. The travel agent stated in an interview that the tickets were purchased with $612.00 cash and were issued in the names of W. Everett and M. Webber.

7. The district court held that Minis had standing to assert the Fourth Amendment violation, having a legitimate expectation of privacy in the premises searched, because he was the caretaker of the entire premises. Although the government moved for reconsideration of the "standing" decision, which motion was denied, they do not raise the "standing" issue on appeal, and we therefore do not consider it here.

probable cause and that, because the affidavit failed to establish probable cause to believe either that marijuana was being grown on the premises or that records of narcotics and foreign currency laundering transactions were present on the premises, the search warrant and subsequent search conducted pursuant to the warrant were invalid.[8]

■ Because the decision of the district court was a determination only of the narrow question whether the information contained in the affidavit satisfied the test of probable cause, it is a ruling of law based strictly on written evidence, and our review is therefore not limited to the "clearly erroneous" standard. *See, e.g., United States v. Pulvano,* 629 F.2d 1151, 1156 (5th Cir. 1980). We instead make an independent review of the sufficiency of the affidavit. *Id.* at 1156–57 n.7. In doing so, though, we are mindful of the oft-cited opinion of this court in *Bastida v. Henderson,* 487 F.2d 860, 863 (5th Cir. 1973):

In issuing a search warrant the magistrate must exercise his own judgment as to whether the facts alleged in the affidavit constitute probable cause for issuance of the warrant, he must act on the entire picture disclosed to him, he is entitled to use his common sense, and the courts have gone so far as to say that when this is done *his determination is conclusive in the absence of arbitrariness.*

(Emphasis added.) *Accord, United States v. Allen,* 588 F.2d 1100, 1105–06 (5th Cir. 1979), *cert. denied sub nom., Perkins v. United States,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), and cases cited therein. Put another way, we have said: "It is axiomatic that an affidavit for search warrant is to be interpreted in a common sense and realistic manner, and the magistrate's finding of probable cause should be

sustained in doubtful or marginal cases." *United States v. Maestas,* 546 F.2d 1177, 1180 (5th Cir. 1977), *citing United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). We are also mindful that "probable cause is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the 'laminated' total." *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978), *quoting Smith v. United States,* 358 F.2d 833, 837 (D.C.Cir.1966), *cert. denied,* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). *Accord, United States v. Weinrich,* 586 F.2d 481, 490 (5th Cir. 1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 and *cert. denied sub nom., Blair v. U. S.,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979).

"Probable cause" means something more than "mere suspicion," *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). Probable cause requires the existence of facts " 'sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed" and the person to be arrested [or searched] committed it. *Id.*

A bright line cannot always be drawn between "mere suspicion" and probable cause.

*United States v. Gordon,* 580 F.2d 827, 832 (5th Cir. 1978), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1979), and *cert. denied sub nom., Garcia v. U. S.,* 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1978). *Accord, United States v. Rasor,* 599 F.2d 1330, 1332 (5th Cir. 1979). Minis argues that there is no evidence establishing that the articles sought would be found at the

---

8. In his motion to suppress, Minis argued, in addition to his argument that the affidavit failed to establish the probable cause constitutionally required for the issuance of a valid search warrant, that the warrant authorized a general search also prohibited by the Fourth Amendment, that the evidence was derived from intercepted communications without

timely receiving a required court order under 18 U.S.C. 2517(5) and that the search of a 1980 Ford pickup was not authorized by the warrant and was not based on a combination of probable cause and exigent circumstances. The district court, however, decided only the probable cause issue.

place sought to be searched. It is not necessary, however, that the articles sought actually have been seen at the place to be searched. In *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977), we stated the test as follows:

The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought were located" at the place where it was proposed to search.

(*quoting United States v. Rahn*, 511 F.2d 290, 293 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975)). Reaffirming that test in *United States v. Scott*, 555 F.2d 522, 527 (5th Cir.), *cert. denied sub nom., Ogletree v. United States*, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977), we observed that "this court and others, albeit without discussion, have upheld searches, although the nexus between the items to be seized and the place to be searched rested not on direct observation but on the normal inferences as to where the articles sought would be located." *See also United States v. Allen*, 588 F.2d 1100 (5th Cir.), *cert. denied sub nom., Perkins v. United States*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *Bastida v. Henderson*, 487 F.2d 860 (5th Cir. 1973); *Castle v. United States*, 287 F.2d 657 (5th Cir.), *vacated for resentencing*, 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75 (1961). *Compare United States v. Green*, 634 F.2d 222 (5th Cir. 1981); *United States v. Rasor*, 599 F.2d 1330 (5th Cir. 1979).

■ As noted above, "[a] bright line cannot always be drawn between 'mere suspicion' and probable cause." *Gordon, supra*, 580 F.2d at 832. Nevertheless, we believe that " 'the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought were located at the place where it was proposed to search.' " *Maestas, supra*, at 1180. In the intercepted July 20, 1980 telephone conversation, according to the affidavit, the person identified as Ever-

ett spoke of his garden, the size of the plants, and about a process of "topping." He also said that he "did a whole bunch of A's" and that they were the ones that "are along the farthest" and which he "got . . . in first." It was reasonable to infer from this conversation, and the affiant's knowledge of "A's" being a slang term for the African variety of marijuana plants, that Everett was cultivating marijuana. When physical surveillance then revealed Everett going from his apartment to a large rural residence, owned by him, for a couple of hours each day, there was probable cause to believe that Everett was growing the marijuana at this location. This property was a "logical" place to find the garden of illicit plants which would grow, according to the conversation, to be five to six feet high and as big around as a man's chest. *Cf. Allen, supra*, at 1106 (search of apartment for gambling paraphernalia); *Scott, supra*, at 527–28 (search of residence for gambling paraphernalia); *Maestas, supra*, at 1180 (search of defendant's apartment for counterfeiting paraphernalia); *Bastida, supra*, at 863 (search of premises where defendants lived for pistols allegedly used in armed robbery). The fact that Everett and Ashbrook travelled to the rural property several days in a row before leaving for the Houston airport where they were arrested also gave probable cause to believe that evidence relating to their narcotics operation would be found at the rural property. Although an individual piece of information, like the placing of the tan leather case in the truck upon leaving for the property and not removing it upon returning from the property, may have been innocent enough in itself, it is an additional layer in the "laminated total" which we weigh to determine probable cause. *See United States v. Weinrich*, 586 F.2d 481, 490 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 and *cert. denied sub nom., Blair v. United States*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243. Looking at all of the facts and circumstances set out in the affidavit, we cannot say that the magistrate, whose determination, based on

the entire picture presented to him and his common sense, is conclusive in the absence of arbitrariness, erred in his conclusion that a person of reasonable caution would believe that the articles sought were located at the place proposed to be searched.

Minis argues that the information derived from the July 20, 1980 conversation allegedly referring to a growing crop of marijuana was so stale that it cannot be considered in determining whether the affidavit established probable cause to justify the issuance of the warrant (the warrant not having been issued until October 18, 1980). "It is a fundamental principle of search and seizure law that the information given to the magistrate in the application for a search warrant must be timely. Probable cause must be found to exist at the time the warrant issues." *United States v. Hyde*, 574 F.2d 856, 864 (5th Cir. 1978). *See Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). Again, *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973), provides the basic rule:

> In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance . . . .

(Citations omitted.) "[S]taleness is an issue which must be decided on the peculiar facts of each case, and . . . a mechanical count of days is of little assistance in this determination." *Hyde, supra*, at 865. *Accord, United States v. Weinrich*, 586 F.2d 481, 491 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402, and *cert. denied sub nom., Blair v. United States*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979). The telephone conversation clearly indicates that the growing of the marijuana was a continuing process. Everett spoke of plants 18″ high which would grow to be five to six feet high. In addition, he spoke of growing the plants the previous year, comparing that year's crop to this year's. The nature of the activity, then, was clearly such that the July conversation combined with the observed October activities could establish probable cause to believe that marijuana was being grown at the searched location at the time the magistrate authorized the search.

### III. The Good Faith Exception to the Exclusionary Rule?

The government cites our alternative opinion in *United States v. Williams*, 622 F.2d 830, 840 (5th Cir. 1980) (en banc), in support of an argument that because the agent had a good faith and reasonable belief in the existence of probable cause and properly presented the facts to the magistrate the evidence should not be suppressed under the exclusionary rule. We do not address that argument here for two reasons: (1) our decision above that the evidence was not properly suppressed eliminates the need to make that determination; and (2) the government did not raise the argument before the district court in the suppression hearing, *see, e.g., Hudspeth v. United States*, 519 F.2d 1055, 1056 (5th Cir. 1975).

### IV. Conclusion.

Our decision here is limited to a determination that the facts and circumstances described in the affidavit were sufficient to establish probable cause. Because the district court did not address Minis' other arguments as to the validity of the warrant, we must remand the case for further proceedings relating to Minis' motion to suppress not inconsistent with this decision.

VACATED and REMANDED.