**Arthur T. BAYLOR, Plaintiff-Appellee,**

v.

**JEFFERSON COUNTY BOARD OF EDUCATION, Defendant-Appellant.**

**No. 83–7417**
**Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

June 8, 1984.

---

Carl E. Johnson, Birmingham, Ala., for defendant-appellant.

C. Michael Quinn, Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiff-appellee.

Before HATCHETT, ANDERSON and CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

In this racial discrimination in employment case, we review the district court's findings that appellant, Jefferson County Board of Education (Board), discriminated against appellee, Arthur T. Baylor, in job assignment, in violation of 42 U.S.C.A. § 1981 (West 1974), and 42 U.S.C.A. § 2000e to 2000e–17 (West 1981). We affirm.

## FACTS

In 1971, Arthur T. Baylor was transferred to Hueytown High School and was assigned to teach physical education and to perform coaching duties. Baylor replaced a white coach. Hueytown High School was at the time, and is, a predominantly white school.

Baylor worked at Hueytown as an assistant football coach under two white coaches and under two white principals prior to 1979. From 1975–1980, Baylor's employee evaluation ranged from excellent to satisfactory.

During the latter part of Baylor's tenure at Hueytown, Pat A. Salamone was the principal. Baylor and Salamone had a friendly working relationship. Baylor had very few problems in his personal relationships at the school until a new head football coach, Morris Higginbotham, arrived during the middle of the 1978–79 school year.

In the Jefferson County School System, the head football coach also holds the position of "athletic coordinator." The football coach, therefore, is always the head of the athletic department and has supervision over all coaches. When Higginbotham arrived at mid-year, Baylor was the head basketball coach and an assistant football coach, and had just completed a highly successful basketball season leading to a berth in the state playoff.

Contemporaneously with Higginbotham's arrival, Principal Salamone approved Baylor's request to take his team to the state playoff in Tuscaloosa, Alabama. Baylor took his players a few days prior to their first scheduled game to watch the competition and to practice.

Immediately upon the basketball team's return from Tuscaloosa, Higginbotham criticized Baylor for spending too much of the school's money and for not being available for the start of spring football practice.

Higginbotham complained to Salamone about Baylor, and Baylor complained to Salamone about Higginbotham. Two of

Higginbotham's complaints against Baylor were that Baylor was not regular in his attendance at meetings of the football coaches, and on one occasion Baylor failed to meet with the other coaches to clean the gym. Higginbotham, however, did not give Baylor notice of most of these meetings.

At the end of the 1978–79 school year, which was also the end of Higginbotham's first year at Hueytown, he and Salamone requested that the Jefferson County Board of Education (Board) transfer Baylor from Hueytown.

Prior to Salamone's having made this request, Salamone discussed the situation with Baylor and asked Baylor if, instead of coaching, he would like a job driving a school bus.

Baylor contested the proposed transfer, and the Board held a hearing on July 11, 1979, at which Baylor and the Board's attorney were present. The parties, however, reached a compromise settlement prior to the 1979–80 school year. Higginbotham was not a party to the settlement agreement.

When school started in the fall of 1979, on the very first day, Salamone and Higginbotham called all the coaches to Salamone's office and presented them with a "job description." This "job description" was prepared by Higginbotham and Salamone, and was the first written job description for assistant coaches at Hueytown.

The job description required, among other things, that the assistant coaches collect uniforms after each sporting event and not allow players to clean their own uniforms. After reading the "job description," Baylor, basketball coach, and Robert Tibbs, baseball coach, verbally expressed their disagreement with the uniform cleaning provision. Immediately thereafter, Higginbotham said to Baylor: "You will clean the uniforms!". He did not make the same remark to Tibbs.

Pursuant to the job description requirements, Baylor cleaned the basketball uniforms; Tibbs, however, did not clean the baseball uniforms and continued to let his players clean them. No evidence exists

that Tibbs, a white coach, was disciplined for his failure to follow the new rule.

Higginbotham took Baylor's key to the field house. Higginbotham reasoned that Baylor no longer needed a key because he was not an assistant football coach. Soon thereafter, Higginbotham took all the basketball equipment and locked it in the field house knowing that Baylor did not have a key to the field house. This was an abrupt change in the past practice at the school.

When Baylor went to the gym to get the basketball equipment to begin the traditional pre-season basketball conditioning program, he found that the equipment was missing. Baylor asked the principal, Salamone, about it. Salamone told Baylor that Higginbotham would tell him when he could have the equipment and begin the pre-season basketball conditioning program.

The next day, Baylor went to Higginbotham and asked about the equipment and the conditioning program. Higginbotham replied: "You aren't going to have the run of this place and I will tell you when to practice."

In the fall of 1979, no Jefferson County or statewide rule existed with regard to when basketball practice could begin. Moreover, no evidence exists which suggests that the white coaches in other sports were subject to similar interferences with their practice commencement dates and access to equipment.

During the basketball season, as a result of a misunderstanding of the rules, Baylor played a "B" team player in a varsity game. Hueytown was fined $50. Prior to playing the two "B" team players, Baylor asked Higginbotham, Salamone, and the system-wide athletic director, Bill Legg, whether such would be permissible under the state athletic rules and regulations. They all approved Baylor's use of the "B" team players. Hueytown was later fined for violating a state athletic association rule, but the Board never reprimanded or disciplined Baylor.

Later, Hueytown High School played Berry High School at Berry. Berry is predominantly white. During the game, one of Hueytown's players made an obscene remark to a referee. As punishment, Baylor removed this player from the team.

As Baylor approached the scoring table for clarification of the foul status of one of his players, Berry's cheering section, yelled "Sit down, nigger." One spectator testified that Baylor responded with an obscene gesture. The next day, Baylor reported the incident of the racial slur to Salamone, asking Salamone not to make an issue of it with Berry's principal.

Toward the end of the academic year of 1979–80, the Hueytown High School Quarterback Club, whose meetings Higginbotham regularly attended, circulated a long petition addressed to the Board. It began with these words: "We hereby petition the Jefferson County Board of Education that it would be it [sic] the best interest of the Hueytown *community* that Arthur Baylor be moved to another teaching assignment in the county." [Emphasis supplied.]

The district court took judicial notice that the Hueytown "community" is predominantly white, whereas the student body at Hueytown High School has many black students who come long distances to school.

Salamone, at the suggestion of Higginbotham, again approached the Board about transferring Baylor. On June 26, 1980, without a hearing, the Board wrote Baylor informing him that it had voted to transfer him from teacher and coach at Hueytown to a position as social studies teacher at Pleasant Grove High School. Baylor was the only black coach at the school and none of the white coaches, not even Coach Tibbs, was transferred or terminated. At that time, no reasons were given for the "transfer" other than "maximum utilization of personnel."

Baylor demanded a hearing. At the hearing, the Board voted to affirm its transfer decision; two board members, however, abstained. On June 8, 1980, Baylor filed an Equal Employment Opportunity Commission (EEOC) charge alleging that the transfer/termination was racially motivated. In a letter to Baylor dated July 16, 1980, the Board set forth five reasons for the transfer.

Baylor filed this action on June 23, 1981, seeking backpay, injunctive and declaratory relief for violations of Title VII of the Civil Rights Act of 1964 and section I of the Civil Rights Act of 1964, 42 U.S.C.A. § 1981 (West 1974). After discovery by both parties, the case was tried before the district court.

The district court subsequently entered findings of fact and conclusions of law on June 17, 1983. In so doing, the court found violations of Title VII and section 1981. On the basis of these findings, the district court awarded back-pay and ordered that Baylor be reinstated into a position as a head coach either in football or in basketball.

## ISSUES

The issues we now consider are: (1) whether the district court's finding of racial discrimination is clearly erroneous; (2) whether the district court incorrectly placed the burden of proof on the Board in its analysis of the facts of this case; and (3) whether the district court abused its discretion when it refused to admit into evidence a transcript of testimony taken at Baylor's 1980 tenure hearing.

## II. DISCUSSION

### 1. Findings of Fact Entered by the District Court

■ On appeal, both parties urge us to examine the proceedings below according to the standard of proof mandated in *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). These cases demand that courts, in Title VII actions, undertake a three step analysis of the evidence. First, the plaintiff must establish a prima facie case of

discrimination. A prima facie case creates a rebuttable "presumption that the employer unlawfully discriminated against" the employee in violation of Title VII. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. *See McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. at 1819.

To rebut this presumption, the defendant must produce evidence that the defendant's action was not motivated by discriminatory intent. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. In other words, the defendant must produce evidence that the plaintiff was rejected, demoted, or someone else was preferred, for a legitimate, non-discriminatory reason. *Id.* at 254, 101 S.Ct. at 1094. To prevail, the plaintiff must successfully attack the defendant's rebuttal as pretextual. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ The district court then must decide the ultimate factual issue in the case: Whether there was intentional discrimination against the plaintiff in violation of Title VII. On this issue, the plaintiff retains the burden of persuasion. He may carry this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. at ——, 103 S.Ct. at 1483.

■ This court's inquiry on appeal is also guided by the principles articulated by the Court in *Burdine* and *Aikens*. The ultimate issue, that of discrimination, is to be treated by district and appellate courts in the same manner as any other issue of fact. *Aikens*, 103 S.Ct. at 1482. Thus, we must review the district court's findings under the "clearly erroneous" standard of Fed.R.Civ. 52(a). *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

■ It is axiomatic that findings of fact entered by the district court will not be set aside unless clearly erroneous. Fed.R. Civ.P. 52(a). *Rowe v. General Motors*

*Corp.*, 457 F.2d 348, 356 n. 15 (5th Cir. 1972). The oft-quoted language of the Supreme Court expressly states:

A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

In the light of this established legal standard, we examine the district court's finding that the Board's transfer of Baylor was racially motivated.

■ In evaluating the Board's assertions, we are bound by established legal precedent which provides that "where the evidence would support a conclusion either way but ... the trial court has decided it to weigh more heavily for the defendant[,] [s]uch a choice between two permissible views of the weight of the evidence is not 'clearly erroneous.'" *United States v. Yellow Cab Co.*, 338 U.S. 338 at 342, 70 S.Ct. 177 at 179, 94 L.Ed. 150 (1949). Thus a district court cannot be held in error merely because the evidence was susceptible to different interpretations, and the choice it made was different than the one the Board hoped for.

■ To be sure, the Board has failed to show that the district court was clearly erroneous when it found that the Board's reasons for transferring Baylor were unworthy of credence. At best, the Board has strung together a series of alternative findings which might have been made but were not compelled to be made on the current record.

After reviewing the evidence, we are not left with a definite and firm conviction that a mistake has been committed; nor are we persuaded that the district court's findings are so against the great preponderance of the credible evidence, that they do not reflect the truth in this case. We conclude that the Board's strung together suggested, alternative findings do not satisfy the

"clearly erroneous" standard demanded by Fed.R.Civ. 52(a), and the Supreme Court's decision in *Yellow Cab Co.*, 338 U.S. at 342, 70 S.Ct. at 179. *See also Merchants National Bank v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338, 1341 (5th Cir. Unit A 1981), *cert. denied*, 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982).

The district court found that the Board not only failed to meet its burden under the *McDonnell* and *Burdine* analyses, but also was remiss under another legal standard articulated by the former Fifth Circuit in *Lee v. Washington Co. Board of Education*, 625 F.2d 1235, 1237 (5th Cir.1980). We conclude that substantial evidence exists to support the district court's findings that the Board's articulated reasons for transferring Baylor were racially motivated and that the Board failed to carry its burden under the *McDonnell* and *Burdine* analyses; thus, we do not reach the "clear and convincing" evidentiary standard prescribed in *Lee*.

In determining whether there has been intentional racial discrimination, "the district court must decide which party's explanation of the employer's motivation it believes." *Aikens*, 103 S.Ct. at 1482. After examining the evidence, the district court believed Baylor. We hold that the Board has failed to demonstrate that the district court's findings are clearly erroneous.

### 2. Burden of Proof

■ The Board argues that the district court incorrectly placed the burden of proof on the Board. This argument evidences a misunderstanding of the Supreme Court's decision in *Burdine*. Additionally, the Board's argument fails to note that the district court's analysis was premised on two separate analyses.

The district court first considered the evidence under a *McDonnell Douglas — Burdine* analysis. The court left the burden of persuasion on Baylor at all times. First, Baylor established his prima facie case of intentional discrimination. Second, the Board was required to "articulate" reasons for its transfer of Baylor. Next, Baylor was required to "prove" the pretext—intent issue under the *McDonnell—Bur-*

*dine* standards. We conclude that the district court correctly found that Baylor met his burden of persuasion on this issue.

Thus, we need not address the court's application of the alternative analysis articulated in *Lee v. Conecuh County Board of Education*, 634 F.2d 959, 963 (5th Cir. 1981). Accordingly, we render no decision on the district court's application of a *Lee* analysis in this case.

We hold that the district court correctly determined that the Board failed under a *McDonnell—Burdine* analysis to produce legally sufficient evidence to justify its employment decision.

### 3. Admissibility of the Transcript into Evidence

■ The Board contends that the trial court erred in excluding the transcript of Baylor's 1980 tenure hearing. Determinations of admissibility of evidence rests largely within the discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion. *United States v. Russell*, 703 F.2d 1243 (11th Cir.1983).

■ At trial, the Board offered into evidence a transcript of a hearing conducted after Baylor had filed his EEOC charge and after the Board had communicated to Baylor its decision to transfer him out of coaching. Baylor objected to this transcript. Believing that the Board's burden of articulating a legitimate, non-discriminatory reason for its employment decision could not be met by proffering the product of an investigation conducted by the Board after the decision to transfer the employee was made, the district court sustained his objection.

The district court correctly concluded that to allow such evidence in Title VII cases would invite employers to conduct self-serving post-employment-decision investigations, to obtain written statements, et cetera, all of which would be hearsay, and then to offer such materials into evidence in an effort to meet their burden of articulating a legitimate, non-discriminatory reason. We agree with the district

court's assessment that such a transcript, or a set of sworn statements, might come within an exception to the hearsay rule, but they are hardly trustworthy substitutes for cross-examinable testimony, especially when they come into being after the decision being judicially scrutinized was made and after the EEOC complaint has been filed.

More importantly, the Board has not pointed to any rule of evidence which makes the transcript admissible as evidence. Federal Rule of Evidence 804(b)(1) allows the receipt of a transcript from another proceeding *only* when the witness is unavailable within the meaning of Federal Rule of Evidence 804(a) and only when the opposing party "had an opportunity and similar motive to develope the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

At trial, the Board did not assert that it satisfied any of the provisions of Federal Rule of Evidence 804(b)(1). The Board did not present any evidence that the witnesses were unavailable within the meaning of rule 804(b)(1), or that Baylor had a motive or opportunity to cross examine the witness(es) on the question of racial discrimination. It cannot be denied that observation of the witnesses' demeanor and cross examination are important to a trial of this type.

Because the Board did not show that the witnesses were unavailable, and that Baylor had a motive or an opportunity to cross examine the witnesses on the present issues, we conclude that the use of the transcript rather than the live witnesses would have deprived both the trier of fact and Baylor of the benefits of cross examination.

■ It is well settled that a successful party in the district court may urge any grounds supported by the record for affirmance irregardless of whether the district court specifically recited those grounds in its decision. *United States v. Allen*, 588 F.2d 1100, 1105 n. 9 (5th Cir. 1979); *Raven v. Panama Canal Co.*, 583 F.2d 169, 171 (5th Cir.1978). Accordingly, the fact that the district court rested its exclusion of the transcript on other grounds and did not specifically state that it relied on Federal Rule of Evidence 804(b)(1) does not change the result in this case.

■ A transcript of another proceeding cannot be admitted in evidence merely because the defendant wants it to be. In this case, it is undisputed that Federal Rule of Evidence 804(a) and (b)(1) were not satisfied in this case. Thus, the transcript was properly excluded. In the absence of proof to the contrary, we hold that the district court did not abuse its discretion when it excluded the transcript of testimony taken at an administrative hearing.

■ Even if it were an abuse of discretion to exclude the transcript, the error was harmless and no prejudice was caused to the Board. None of the witnesses whose testimony appears in the transcript were unavailable to testify at the trial, and the Board never contended that they were. The record reveals that the transcript was excluded at a stage in the trial at which the Board still could have called each of the witnesses to testify in this action. The record does not reveal that the Board requested the opportunity to do so. The Board has not demonstrated that the exclusion of the transcript prevented it from producing any of the witnesses to testify in this action.

Moreover, the record does not indicate that the Board requested a postponement of the trial so that it could produce any witness who testified in the administrative hearing. Several of the witnesses who appeared in the transcript also appeared to testify at this trial. Thus, any error or abuse of discretion resulting from the district court's exclusion of the transcript was harmless and no prejudice was caused the Board.

## CONCLUSION

We hold that the district court's finding of racial discrimination is not clearly erroneous, that the district court correctly applied the law to the facts of this case, and that the district court did not abuse its

discretion when it excluded, from evidence, a transcript of testimony taken from another proceeding. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.